HENRY W. KINGSBURY, an infant, by his next friend,

v.

AMBROSE E. BURNSIDE et al.

and

MARY K. BUCKNER and

SIMON B. BUCKNER

v.

HENRY W. KINGSBURY et al.

1. DELIVERY OF A DEED—*what constitutes.* If a grantor, with or without any previous arrangement with the grantee, sign, seal and acknowledge a deed, place it in the hands of the register to be recorded, notify the grantee of the act, and he assent to receive it, by words only, this would be a good delivery, though the grantee die before taking it into his actual possession; because the assent is the principal element, and taking the deed into possession is not indispensable, but only evidence of assent and acceptance.

2. A deed, signed, sealed and acknowledged without the knowledge or assent of the grantee, was sent by the grantor to a third person at the place where the land was situate, such third person being a stranger to the transaction, not authorized by the grantee to receive the deed, but with the simple direction from the grantor to have it recorded. There was no declaration that it was delivered for the grantee's use, nor was it delivered as an *escrow:* *Held,* the person to whom the deed was thus sent was a mere medium through whom it was to pass to the hands of the recorder; the act did not constitute a delivery, in the legal sense.

3. The mere act of recording a deed, under such circumstances, would not amount to a delivery.

4. SAME—*from what time a deed will take effect.* And during the time intervening the placing of the deed in the hands of the register to be recorded and the giving of his assent by the grantee, the deed will remain wholly inoperative for any purpose, and might, during that time, be reclaimed by the grantor and cancelled, with no other effect than that, perhaps, of casting a cloud upon his title, by its being recorded. A deed takes effect only from its delivery, with a few exceptions, where the necessities of the case require the application of the doctrine of relation, and there could be no delivery until the grantee gave his assent.

5. SAME—*what will amount to an acceptance by the grantee.* A party who held the legal title to a tract of land, but upon a secret parol trust for his wife, executed a deed therefor, in which his wife also joined, to the brother of the latter, and placed the same in the hands of the proper officer to be recorded, the grantee having no knowledge of the act until some time afterward, when, upon meeting the grantee, the grantor said to him: "By the way, the property of your sister has been deeded to you, and I want you to look after her interests, and see that she has her property," to which the grantee replied: "That was all right," or "Very well," or words to that effect: *Held,* this constituted an acceptance of the deed by the grantee.

6. RESULTING TRUST—*whether it can arise.* When there is an express trust, there can be no foundation for an implied or resulting trust.

7. TRUST—*in what manner it may be created.* Where a deed has been executed, which is absolute in form, and filed for record, but without the knowledge or assent of the grantee, and the latter afterward signify his acceptance, by mere words, the very words by which the deed would thus become operative, would operate to create a trust by contract in respect to the property, where one was intended, which, if manifested and proved by some writing signed by the grantee, as required by the statute of frauds, would be valid.

8. SAME—*statute of frauds—what amounts to a sufficient manifestation in writing.* In order to establish a trust, under the statute of frauds, it is not necessary it should be declared in writing, but it is sufficient if it be *manifested and proved* by writing.

9. Nor is it necessary to produce an instrument expressly framed for the purpose of acknowledging the trust,—it is fully sufficient if the recognition or admission of it is incidentally made in the course of a correspondence. Nor is it material that such correspondence be with a person other than the one claiming to be *cestui que trust,* or that it occurred subsequent to the passing of the title of the trust property to the trustee.

10. In this case, a deed, absolute in form, and expressing the nominal consideration of one dollar, was executed by the grantors, husband and wife, to a brother of the latter, and for valuable real estate held in the name of the husband on a secret parol trust for the wife. The grantee had no knowledge of the deed, or of any intention to make it, until after it was executed and filed for record; but when notified of the fact, he manifested his acceptance of it. Subsequently, the grantee, in a letter to his mother, said: "I spent all the morning with Burnside yesterday. He states, as I told you, that Simon had made over the Chicago property that was held in his name, to me. A new power of attorney is therefore necessary for you and myself. We made one out. I signed it; Burnside will send it to you. I send you a copy for your own keeping, and keep one for myself." The power of attorney was to Ambrose E. Burnside, appointing him attorney "to transact and conduct the business of the Kingsbury estate at Chicago," the property

conveyed by the deed. The copy of the power accompanying the letter was regarded as a part of it, for all legal purposes. The grantors in the deed were Simon B. Buckner and wife. It was *held*, this letter was a sufficient *manifestation in writing*, within the statute of frauds, to establish the fact that the grantee in the deed held the property in trust, and not for his own benefit. And this view was regarded as strengthened by reference to the will of the grantee, made prior to his death, in which occurs this clause : "To my sister, Mary J. Buckner, I leave as much of *the* Chicago property *held in my name* as shall amount to one-third of the property in the city of Chicago left by my father," the other portions of the will describing the property devised as "*my* property ;" and so far as the will pertained to this inquiry, it was immaterial whether that instrument was valid and operative as a will or not.

11.   SAME—*parol proof of a trust—to what extent allowable.* As the letter thus written by the grantee to his mother made reference to a particular conversation in respect to the subject of the trust which was thus manifested in writing, and the letter itself not fully disclosing the character of the trust, it was competent to prove by parol the words referred to in the letter, for the purpose of describing or defining what was meant by the letter, as showing the truth of the transaction.

12.   WILLS—*by what laws governed.* Where a will is executed in another State, but devising real estate lying in this State, if it be properly executed, and admitted to probate, it will be governed by the laws of this State.

These cases arise upon an original and cross bill in chancery exhibited in the Cook county circuit court.

On the 26th day of June, 1856, Julius J. B. Kingsbury, being seized in fee of the real estate described in the pleadings, and situate in said county, in the State of Illinois, died at the city of Washington, D. C., intestate, leaving him surviving, his widow, Jane C. Kingsbury, and two children, viz: Mary Jane and Henry W. Kingsbury. Mary, on the second day of May, 1850, married Simon B. Buckner, and after her marriage adopted the name of Mary Kingsbury Buckner, by which she was known. Of this marriage was a daughter, born March 7, 1858, still living. Henry W. Kingsbury was about the age of nineteen years at the death of his father ; had a considerable time previously kept in school, and soon after his father's death was entered at the military academy, as a cadet, where he remained for the period of almost five years, and

from which position he was promoted to one in the U. S. army, in May, 1861. It appears that his father was also a graduate of the same military academy, and spent nearly all of his after life in military service, never acquiring a domicil at any place. That Henry W. had never, at any time, taken any part in the management of the property in question, except that he was sometimes consulted by Buckner, who had the general management of it from March, 1855, under a power of attorney from his father-in-law, until 1858 ; that Henry W. had very little, if any, experience in business or acquaintance with the particulars of his father's estate ; that the relations between Buckner and his father-in-law were friendly and confidential, so much so that in January, 1855, the latter conveyed to the former, by deed, absolute on its face, but really upon a secret parol trust, a strip of land of great value, being a part of that known as the "Kingsbury Tract," and seventy-five feet wide, lying along the north branch of the Chicago river, in the city of Chicago, the legal title to which remained in Buckner, at the time of the death of his father-in-law, and until May, 1861. The relations between Buckner, Mary his wife, and Henry W., were always of a very confidential and affectionate character. That Buckner received a military education at West Point, and from the time of graduating, in 1844, belonged to the regular army, and as a commissioned officer therein, was engaged in the Mexican war, as was Julius J. B. Kingsbury, also. After his marriage, Buckner, at the solicitation of his father-in-law, resigned his commission in the army, to become, as he did, the general managing agent of the property in question.

It appears that, aside from her interest in the property in question, as heir-at-law of Julius J. B. Kingsbury, Mrs. Buckner had no property in her own right, except a small interest in property inherited from her father, situate in Waterbury, Conn., which interest was of the value not to exceed $3500. That in May, 1861, Buckner was the owner, in his own right, of real estate in Hart county, Ky., valued by him at $40,000 ; a house and lot in Louisville valued at $20,000,

and lands in the State of Minnesota valued at $4000. Under these circumstances, Buckner and wife, on the fifteenth day of May, 1861, at Louisville, Ky., where they resided, joined in a deed to Henry W. Kingsbury, as follows:

" Be it known, that Simon B. Buckner and Mary K. Buckner, his wife, of the city of Louisville and State of Kentucky, in consideration of the sum of one dollar in hand paid, and the natural love and affection we bear to our brother Henry W. Kingsbury, do hereby grant, bargain, sell and convey to said Henry W. Kingsbury, of the United States army, his heirs and assigns forever, the following property, viz:

" One undivided half of lots number five (5) and six (6) in block number thirty-five (35), in the original town of Chicago, in the county of Cook and State of Illinois; and also all our right, title and interest in the ' Kingsbury Tract' so called, being the tract of thirty-five acres, more or less, purchased from James Kinzie by the late Major Julius J. B. Kingsbury, of the U. S. army, as per deed of said Kinzie on record in the clerk's office of Cook county, Illinois; the said tract being the south half of what remained of the N. W. qr. of sec. 9, in township 39, range 14, in said Cook county, after deducting therefrom the town of Wabansia. The other interest in said lands and tenements, &c., included in this deed, now belongs to said Henry W. Kingsbury, as one of the heirs of the late J. J. B. Kingsbury, and the entire property being subject to the dower interest of Mrs. Jane C. Kingsbury.

" To have and to hold the same to the said grantee, his heirs and assigns forever, the grantor covenanting that...... will warrant the property hereby conveyed.

" In witness whereof we have hereunto set our hands and seals at Louisville, this fifteenth day of May, 1861.

SIMON B. BUCKNER, [SEAL.]<br>
MARY K. BUCKNER, [SEAL.]

" STATE OF KENTUCKY,     }<br>
   COUNTY OF JEFFERSON.  } SCT.

" Be it remembered that on this fifteenth day of May, A. D. 1861, before me, C. L. Thomasson, a notary public in and for

said State and county, duly commissioned and qualified, personally appeared Simon B. Buckner and Mary K. Buckner, his wife, who are personally known to me to be the persons whose names are subscribed to the foregoing deed as having executed the same, and acknowledged that they had executed the same for the uses and purposes therein expressed.

" And the said Mary K. Buckner, wife of the said Simon B. Buckner, being of lawful age, and having been by me separate and apart from her said husband examined, and the contents of the said deed fully made known and explained to her, acknowledged that she had executed the same and relinquished her dower to the lands and tenements therein mentioned voluntarily and without compulsion of her said husband.

" In witness whereof I have hereunto set my hand and affixed my official seal this fifteenth day of May, A. D. 1861.

"C. L. THOMASSON,

[L. S.]　　　　　　　　　　　　　　Notary Public for

Jefferson county, Kentucky. "

It appears that there was in fact no pecuniary consideration for this deed. That it was signed, sealed and acknowledged in the absence of the grantee and wholly without his knowledge, and without any previous arrangement or communication between the parties on the subject. That it was sent by Buckner to his agent at Chicago, with directions to place it on record, which was done on the seventeenth day of May, 1861. The deed appears never to have been in the hands or possession of the grantee, but to have remained in the recorder's office. Buckner, in the letter accompanying the deed to his agent, directed him " to report all further proceedings to General Burnside, as he did not wish to be consulted in the matter any further. "

On the seventh day of July, 1861, Buckner, while walking with Henry W. Kingsbury, in the city of Washington, said to the latter: " By the way, the property of your sister has been deeded to you, and I want you to look after her interests, and see that she has her property." To which Henry replied, " All

right," or "Very well," or words to that effect. This appears to be the first knowledge Henry had of the transaction. It appears that the interest of Mrs. Buckner in the property covered by the deed was of the value, at that time, of $500,000.

In August or September, 1861, Henry W. Kingsbury and his mother, Mrs. Jane C. Kingsbury, met at Old Lynn, Conn., and she testifies that she then asked him in regard to his sister's property; whether it had been turned over to him (Henry), and told him that Simon had told her so. That he replied: "That is so; but don't look concerned, it is only turned over to me for safe keeping; it will be restored to her." After this conversation, and on the 23d day of October, 1861, Henry W. wrote a letter to his mother, at Arlington, Va., and bearing that date, which she received, in which he said: "I spent all the morning with Burnside yesterday. He states, as I told you, that Simon had made over the Chicago property that was held in his name, to me. A new power of attorney is therefore necessary for you and myself. We made one out. I signed it. Burnside will send it to you. I send you a copy for your own keeping, and keep one for myself." This letter was closed and signed by Henry W. Kingsbury, thus: "Believe me, dear mother, your affectionate Henry."

She testifies that between the time of the conversation with him at Old Lynn, in August or September, 1861, above stated, and the receipt of this letter, she had not seen him, written to him or received any letter from him.

The power of attorney referred to in this letter is dated October 22, 1861, and was executed by Henry W. to Ambrose E. Burnside, appointing him attorney " to transact and conduct the business of the Kingsbury estate of Chicago," &c.

At the time the letter was written and the power of attorney made to Burnside, Buckner was in the army of the so called Confederate States, and his wife within its military lines, they having gone there September 16, 1861, and at the same time Henry W. Kingsbury was first lieutenant in the fifth regiment of artillery, and was in the service of the Union army, at Arlington, Va.

On the fifth day of December, 1861, Henry W. Kingsbury married Eva McLean Taylor, and with his bride visited his mother at Old Lynn, Conn., arriving there, as the latter testifies, on the ninth, and leaving on the eleventh, same month. That during that visit, and on the tenth day of December, the mother again referred to the subject of Mrs. Buckner's share in her father's estate, and she testifies that " He then made the same remarks, that the property would all be restored to her." Witness then asked him " who was to see to it ? " He replied: " If I am taken away, and General Burnside lives, he will see to it for you that Mary's property is restored to her." He said: " I am going to make my will; I am going to give you (witness) $20,000 to do what you please with at your death, I mean mine, out of my property, and not my sister's." He said " he hoped the war would soon close, and Mary would come home and attend to her own property." This was the last time witness saw him. The person referred to as " Simon " was Mr. Buckner.

It further appears that on the 25th of March, 1862, Henry W. Kingsbury, at Fortress Monroe, Va., and while in the military service, there wrote in his own hand and executed the following instrument in writing:

" Expecting soon to start upon a military expedition, where death may overtake me, I leave this as a record of my wishes respecting the disposition of my property.

" To my mother, Jane C. Kingsbury, I leave twenty thousand dollars, or so much of my Chicago property as upon fair appraisal may be valued at that amount.

" To my sister, Mary J. Buckner, I leave so much of the Chicago property held in my name as shall amount to one-third of the property in the city of Chicago, Ill., left by my father, Julius J. B. Kingsbury, deceased.

" To my cousin, John J. D. Kingsbury, I leave my property in Waterbury, Connecticut, and in addition thereto, five thousand dollars, which I trust he will expend in completing his education.

" The remainder of my property of every description I leave to my devoted wife Eva. I desire, moreover, that the provisions of this will may be so carried out that the yearly income of my wife, for her own personal support, shall never be less than two thousand dollars ($2000). "

" As executors I name General Ambrose E. Burnside, of Rhode Island, and Captain John Taylor, Com. Dept. U. S. Army.

 Signed at Fortress Monroe, Va., March 25th, 1862.

       HENRY W. KINGSBURY,

   1st Lt. 5th Regt. Artillery, U. S. Army. "

It appears that no other property in Cook county, Illinois, was held in the name of Henry W. Kingsbury, or was conveyed to him by deed, except that embraced in the deed of Buckner and wife of May 15th, 1861. The above instrument, designed as a will, was left with Capt. John McLean Taylor, who was named as one of the executors, and the brother of the testator's wife, for safe keeping.

On the 17th of September, 1862, Henry W. Kingsbury, who was then in command of the 11th regiment of Connecticut volunteers, was mortally wounded at the battle of Antietam. He was under Maj. Gen. Burnside, who commanded the left wing of the army of the Potomac. After Henry was wounded, he was visited by Gen. Burnside, who testifies that he had a conversation with him in regard to his business. Witness says : " When information came to me that he was wounded, I went to see him. He told me that he feared he was mortally wounded, and requested that he should not be moved from the place he was in. He also requested me to look after the interests of his wife, mother and sister. I asked him if he had any instructions to give me. He said, in substance, that he had already left the necessary directions as to his affairs, as I would see in the future. "

On the 18th of September, 1862, Henry W. Kingsbury died of the wound received in battle, and on the 28th of the same month his widow, Mrs. Eva Kingsbury, wrote a letter to his

mother, Mrs. Jane C. Kingsbury, enclosing a copy of the will above set forth, remarking, "I send you a copy of a paper written by Henry and left in my brother's charge, just before he started on the campaign of the Peninsula."

It appears that immediately after the death of Henry, the will was submitted to Mr. Latrobe, a counselor-at-law, at Baltimore, for his legal opinion, which was given to Colonel Taylor, by letter of October 16th, 1862. He held that the will was not provable by the laws of Illinois, because it was not attested by two witnesses. He advised the widow not to commit herself in reference to the matter, and to obtain control of the whole business.

On the fourth of November, 1862, Mrs. Eva Kingsbury, the widow of Henry, wrote a letter to his mother, the portion of which relating to this matter was as follows: "Mr. Latrobe has been to see me. He will put everything straight right away. I send you a copy of a letter I wrote to Burnside. Mr. Latrobe used to be in the army. He was at West Point with your husband, and they were great friends. He says the will can not be made valid ; but he tells me at the same time that I can give Mary everything she is entitled to. I am very anxious to have everything fixed before next month. So much depends upon my child. If it lives it will inherit everything; but I will be its guardian, and can act for it until it becomes of age. If it lives but for one moment; if it just breathes, or shows signs of life and then dies, I, as its heir, inherit everything from it. I wish that you could hear Mr. Latrobe talk. He makes everything so plain. I have put everything in his hands, giving him for his guide, Henry's will. I have tried to do, mother, as I think my husband would wish me to, and from what you said to me in Brooklyn, I think I am doing as you would if you were here. If there is anything that you want me to do, or anything that I have done that you do not approve of, do not hesitate to tell me. I send you also a copy of a letter I wrote to Mr. Latrobe."

In the letter referred to she says: "I am about to take advantage of your kind offer to attend to my business affairs, and to ask you to become my legal adviser, and show me the proper way of carrying out my husband's plans and wishes. You know, of course, that I am perfectly ignorant of all the forms necessary. I would like to see you at your earliest convenience, for I can talk more plainly than I can write, and am very anxious to have everything settled at once."

On the 16th of December, 1862, Mrs. Eva gave birth to a son, who was named Henry W. Kingsbury; and during that month her husband's mother visited her, and in a conversation about the property the latter said, as Mrs. Jane C. testifies: "She was sorry Henry's wishes could not be carried out; but the laws were such they could not be; that she would teach her son, as he grew up, that the property did not belong to him, and that he should return it to Mrs. Buckner."

In September, 1865, Mrs. Eva Kingsbury married Albert G. Lawrence.

It appears that the first knowledge Mrs. Buckner had of the existence of the will, was when on a visit to her mother in the fall of 1866. The copy sent to her mother by Henry's widow was exhibited and copied. Neither of them had ever seen the original, which was found by General Burnside, the 12th of June, 1869, in the possession of one R. G. Hazard, in New York City, who claimed to hold it for Mrs. Lawrence, and who refused to let him have it without an order from Mrs. Lawrence, and possession of it was obtained only through a contested application made to the surrogate of the county, about the first of May, 1870; and on the ninth of same month, upon the petition of Gen. Burnside, was admitted to probate in and by the corporation court of the city of Alexandria, Va., and letters testamentary issued to Gen. Burnside, and on the 11th day of July, 1870, an authenticated copy of the will, purporting to have been proved, according to the laws of Virginia, and accompanied by certificates of the proper officers that the will was duly executed and proved agreeably to the laws of that State,

1871.]        KINGSBURY *v.* BURNSIDE *et al.*        321

Statement of the case.    Opinion of the Court.

was exhibited to the county court of Cook county, and there-
upon such proceedings were had that the will was ordered to be
and was recorded, as provided by the Statute of Wills, in this
State.

Whereupon a bill was filed on behalf of the infant Henry
W. Kingsbury, alleging the will to be void, but a cloud upon
his title, and asking to have such cloud removed.

Buckner and wife having answered this bill, filed their cross
bill, alleging the deed of May 15th, 1861, to have been made
without consideration and without any use stated in it, where-
fore a use or trust resulted in favor of the grantors ; also, that
the trust was manifested by writing signed by the grantee, set-
ting out the letter of October 23d, 1861, to Mrs. Jane C.
Kingsbury, and setting up the will, praying that the trust be
declared by the court, and executed by the proper conveyance,
to Mrs. Buckner, her husband renouncing all claim to the
property. ·

A hearing was had on the original and cross cause, upon
pleadings, proofs and exhibits, and the court below dismissed
both the original and cross bills without prejudice, and the
complainants in both bills bring the case to this court by appeal
and stipulation.

Messrs. BECKWITH, AYER & KALES, for Henry W. Kings-
bury.

Messrs. GOUDY & CHANDLER, for Mary K. Buckner and
others.

Mr. JUSTICE McALLISTER delivered the opinion of the Court:

The first point which claims the consideration of the court
is, whether the deed from Buckner and wife to Henry W. Kings-
bury, was ever so far legally executed as to become operative.

It was signed, sealed and acknowledged at Louisville, Ken-
tucky, May 15, 1861, in the absence, and without the knowl-
edge or assent of Kingsbury; then sent to Chicago, by Buck-
ner to Mitchell, a stranger to the transaction, not authorized by

21—58TH ILL.

the grantee to receive it, but with the simple direction from Buckner to have it recorded. It was placed on file on the 17th of May, and there remained until after the death of Kingsbury, occurring in September, 1862. There is no evidence that Kingsbury ever had it in his possession, or even saw it, but it is quite conclusive the other way.

"It is necessary to the validity of a deed that there be a grantee willing to accept it. It is a contract, a parting with property by the grantor, and an acceptance thereof by the grantee." *Jackson* v. *Bodle,* 20 Johns. R. 184.

In *Jackson* v. *Dunlap,* 1 Johns. Cases, 114, the court said: "It is also essential to the legal operation of a deed that the grantee assents to receive it. It can not be imposed on him and there can be no delivery without acceptance."

This rule is expressly recognized in *Herbert* v. *Herbert,* Breese, 278, where the court say: "It is also held to be essential to the legal operation of the deed that the grantee assents to receive it, and there can be no delivery without acceptance." In this case the authorities are quoted as establishing this general doctrine: "It may be delivered to the party himself, to whom it is made, or to any other person by sufficient authority from him." So far, it is entirely consistent with the principle of the rule above enunciated; but it proceeds: "Or it may be delivered to a stranger, for and in behalf, and to the use of him to whom it is made without authority; but if it be delivered to a stranger without any such declaration, unless it be delivered as an *escrow,* it seems that it is not a sufficient delivery," citing *Jackson* v. *Phipps,* 12 Johns. 419; 1 Shep. Touch. 57, 58; 2 Black. Com. 307; Viners' Ab. 27, Sec. 52.

Taken literally, the latter branch of the rule seems to be inconsistent with the principle of that above enunciated. Because so taken, it imports that when a deed is made to one without authority, and is delivered to a stranger for the use of him for whom it is so made, with a declaration by the grantor to that effect, then there is a delivery which makes the

deed operative, whether the grantee assent or accept it or not. If this be so, it therefore follows, that although a deed be a contract, as was said by SPENCER, Chief Justice, in *Jackson* v. *Bodle, supra,* that is, a parting with property by the grantor and an acceptance thereof by the grantee, yet such contract may be completed by the acts and words of the grantor alone, without the assent of the grantee. Suppose it be one from which the grantee derives no benefit, but it subjects him to a duty, the performance of a trust, can he be obligated to the performance of such trust by the mere act of delivery and declaration of purpose by the grantor to an unauthorized stranger? If it be said that such act and words may bind the grantor, though perhaps not the grantee, then we' have an instance of a contract where only one of the parties to it is bound, without any condition to that effect contained in it—where the grantor is estopped by deed and the grantee not estopped.

It must be that the rule under consideration can not be taken literally; but that the principle underlying it is, after all, assent, presumptive or actual, on the part of the grantee; that he must take the deed, and thus ratify the previous acts or then existing circumstances, or the deed of such a nature that the assent will be presumed, in the absence of proof to the contrary. Suppose the stranger to whom the delivery is made, offer the deed to the grantee, and this is his first knowledge of it, has he no option? May he not refuse to accept it? Would tender to the grantee and refusal, be equivalent to acceptance? But suppose the stranger should not offer it, and the grantee, without knowledge of, or assent to it, should die, would the property embraced go to his heirs, charged, perhaps, with a trust? There seem to be authorities which go this extent. *Taw* v. *Bury,* 2 Dyer, 167 b, and *Alford and Lea's case,* 2 Leon. 110, are of the class. Lord COKE, in *Butler* v. *Baker,* 3 Coke, 26 b, makes an explanation of the doctrine thus : " If A make an obligation to B, and deliver it to C to the use of B, this is the deed of A presently. But if C offer it to B, then B may refuse *in pais* and thereby the obligation will lose its force." *Taw's case.*

KENT, in speaking of *Taw* v. *Bury,* and *Alford and Lea's case,* says: "It appears difficult to sustain the law of these cases, unless on the ground of the subsequent possession of the deed by the grantee and its relation back. Lord COKE in *Butler and Baker's case,* (3 Coke, 26 b) explains this point by admitting that B may refuse the deed *in pais* when offered, and then the obligation will lose its force." 4 Kent's Com. 455, note b.

This examination of the grounds upon which a legal delivery rests, is made for the purpose of ascertaining when, if ever, and under what circumstances, the deed in question became operative. That a deed takes effect only from the time of delivery, with a few exceptions, where the necessities of the case require the application of the doctrine of relation, there can be no doubt.

Was the act of sending it to Mitchell a delivery? He was a stranger and had no authority from the grantee to receive it. There was no declaration that it was delivered to him for the grantee's use; nor was it delivered as an *escrow.* But it was sent merely to have it filed for record. He was, therefore, a mere medium through which it was to pass to the hands of the recorder. The act was no more of a delivery, in the legal sense, than placing it in the possession of the carrier, to be conveyed from Louisville to Chicago,—than if Buckner had taken it himself to the recorder to be recorded. In *Herbert* v. *Herbert, supra,* it was expressly held, under the circumstances of that case, that "the act of recording a deed can not amount to a delivery, when there does not appear an assent or knowledge by the grantee, of the act."

There not only does not appear any assent, or knowledge on the part of Henry W. Kingsbury, of the act of recording the deed, but the want of both as clearly appears as any fact in the case. On the 17th of May, therefore, when the deed was recorded, it was not so far legally executed as to become operative. The delivery of a deed is usually shown by proving the fact of the grantee having it in his possession, or by other

circumstances tending to the same conclusion. *Jackson* v. *Perkins,* 2 Wend. 308. In *Chapel* v. *Bull,* 17 Mass. R. 212, the court says: "A deed delivered at the register's office, in the absence of the grantee, has been held with us to be a good delivery to the grantee, if he afterwards assent and take the deed." *Harrison* v. *Trustees, &c.,* 12 Mass. R. 456.

"The delivery of a deed, duly executed and acknowledged, to the register, aided by a subsequent possession of the deed by the grantee, might be evidence of a delivery to him." 2 Hil. on Real Prop. 284, citing *Beers* v. *Broome,* 4 Conn. R. 247, *Dawson* v. *Dawson,* Rice R. 243.

But here, the delivery of it at the recorder's office, is not aided by a subsequent possession of it by the grantee. There is not only no evidence that he ever had possession of it, or of circumstances tending to that conclusion, but it appears affirmatively that he never had. The only evidence from which assent to, and acceptance of the deed by the grantee, can be inferred, consists of the conversation between him and Buckner in July 1861, in Washington, and the grantee's letter to his mother, of the 23rd October, 1861, referring to a previous conversation between them in August or September, same year.

Buckner relates the conversation thus: They (himself and grantee) were walking on the street near the president's house, talking of the troubles in the country, when Buckner remarked: "By the way, the property of your sister has been deeded to you, and I want you to look after her interests and see that she has her property." To which Kingsbury replied: "That was all right," or "very well," or words to that effect. This was the only conversation they ever had on the subject, and the first time Kingsbury ever heard of the deed.

Subsequently, and in August or September, 1861, the grantee visited his mother in Old Lynn, Connecticut, and she testifies that she asked him in regard to his sister's property, whether it had been turned over to him, and told him that Simon (Buckner,) had told her so. He (grantee,) replied: "That is so,

but don't look concerned; it is only turned over to me for safe keeping; it will be restored to her."

This shows that Henry W. Kingsbury understood Buckner as meaning, in the remark made in July, that his wife's property had been deeded to the former in trust for her use. Then, without any communication, either by letter or otherwise, between him and his mother, intervening the conversation just referred to, and the date of the letter of the 23rd October, 1861, the grantee in that letter, written and signed by him, says to his mother, "I spent all the morning with Burnside yesterday. He states, as I told you, that Simon had made over the Chicago property that was held in his name to me; a new power of attorney is therefore necessary for you and myself. We made one out. I signed it; Burnside will send it to you. I send you a copy for your own keeping and keep one for myself."

The power of attorney so referred to, is as much a part of the letter, for all legal purposes, as if it had been copied at length into it, and tends to explain what property was intended by the statement that Simon had made over to him the Chicago property that was held in his name. The power of attorney is to Ambrose E. Burnside, appointing him attorney "to transact and conduct the business of the Kingsbury estate at Chicago," &c. The deed of the 15th May, 1861, was the only conveyance to Henry W. Kingsbury, to which Simon B. Buckner was a party, and was the only one to him•from any source, and from the extrinsic facts and circumstances in evidence—especially the fact that there had been, at the time of writing the letter, no occasion upon which he had told his mother any thing about the property having been made or turned over to him, except that above referred to, upon his recent visit to his mother at Old Lynn,—we must hold that the letter points unerringly to that conversation, the effect of which, in another aspect, will be considered hereafter. We are now attempting a solution of the question of the delivery of the deed. The evidence bearing most directly upon that point, is the brief but direct conversation between the grantee and Buckner in July,

at Washington  The other subsequent acts and declarations of Kingsbury are viewed, in this connection, simply as showing his understanding of the position he had assumed in regard to his sister's property.

There can be no doubt, that up to the time of Buckner and the grantee meeting in July, the deed had not become operative.  Although the grantors had parted with the personal possession of it, by leaving it with the recorder, still they could, at any time, have reclaimed and canceled it, with no other effect than that, perhaps, of casting a cloud upon their title, by its being recorded.  The question to which we are directly brought is, therefore, whether, while the deed was so in the hands of the recorder, it was competent for the parties to effectuate a delivery and make the deed operative, by mere words alone, without any manual or personal possession of the deed by the grantee, or a previously authorized agent?  By the old rule, delivery was said to be "either actual, by doing something and saying nothing, or else verbal, by saying something and doing nothing, or it may be both; but by one of them it must be made, for otherwise, though it be never so well sealed and written, yet is the deed of no force." *Herbert* v. *Herbert, supra; Bryan* v. *Walsh,* 2 Gilm. 557; *Bennett et al.* v. *Waller et al.* 23 Ills. 97.  If a grantor, with or without any previous arrangement with the grantee, sign, seal and acknowledge a deed, place it in the hands of the register to be recorded, notify the grantee of the act, and he assent to receive it, by words only, this would be a good delivery, though the grantee die before taking it into his actual possession ; because the assent is the principal element, and taking the deed into possession is not indispensable, but only evidence of assent and acceptance.

We think, therefore, that when Buckner notified Kingsbury, in July, of the making of the deed, the latter by his reply assented to receive it, and that this view is confirmed by his subsequent acts and declarations.  The deed, then, for the first time became operative.  But by the very words which made

it operative was created a trust by :contract, which, if manifested and proved by some writing signed by the grantee, as required by the statute of frauds, is valid. This conclusion disposes of the question of resulting trust in this case so strenuously insisted upon in agument. When there is an express trust, there can be no foundation for an implied or resulting trust. Whether the declaration of such trust was manifested and proved by some writing signed by the grantee, within the meaning of that statute, is the question which now demands our consideration. This statute was passed in 1827. It was, in this respect, borrowed from and is but a copy of the English statute of 29 Car. 2, which had been in force in the mother country since 1677, and received a construction, by the courts of that country, long anterior to its adoption here; from which we must presume that it was adopted with the construction so given it, or else the language would have been changed.

The fourth section of the English statute, as to certain contracts, required the agreement itself to be in writing, signed, (*Wain* v. *Warlters,* 5 East, 10,) whereas the seventh section, respecting trusts, is worded very differently, and requires only that all declarations or creations of trusts should be *manifested and proved* by some writing signed by the party. Upon the strength of this peculiarity in the wording of the clause, it was held that letters and other written documents, though long posterior in date to the transaction itself, would have an operation equivalent to that of a formal and coeval declaration of trust. In *Forster* v. *Hale,* decided by the Master of the Rolls in 1798 (3 Ves. Jun. 696), and by Lord Chancellor LOUGHBOROUGH in 1800 (5 Ves. 308), the chancellor entirely agreed with the Master of the Rolls in adopting the letter as a clear declaration of trust, by which he said he meant clear evidence in writing, that there was such a trust. It is not necessary, continued his lordship, that it should be a declaration, but a writing, signed by the party, may be evidence of a trust admitted in that writing. Nor was it necessary to produce an instrument expressly framed for the purpose of acknowledging

the trust, it is fully sufficient, if the recognition or admission of it is incidèntally made in the course of a correspondence. But when letters are to manifest a trust, there must be a clear demonstration that they relate to the subject; and it appears from *Forster* v. *Hale,* as well as from the cases of *Tawney* v. *Crowther,* 3 Bro. Ch. R. 161, 318, and *O'Hara* v. *O'Neil,* 7 Bro. P. C. 39, that if the letters afford evidence of the existence of a trust, the terms may be supplied *aliunde.* Roberts on Frauds, 101, 102.

"The principal point to be noticed is, that trusts are not necessarily to be declared in writing; but only to be *manifested and proved* by writing; for, if there be written evidence of the existence of such a trust, the danger of parol declarations, against which the statute was directed, is effectually removed." Lewin on Trusts, 63, citing *Forster* v. *Hale, supra.*

" When there is any written evidence showing that the person apparently entitled is not really so, parol evidence may be admitted to show the trust under which he actually holds the estate." Browne on Frauds, p. 110, sec. 111, citing *Cripps* v. *Jee,* 4 Bro. Ch. R. 472; *Hutchins* v. *Lee,* 1 Atk. 447. To the same effect, 2 Sug. on Vend. 7th Am. Ed. 911; Hill on Trustees, 62.

A great number of cases were cited at bar, varying in facts and circumstances, though tending, perhaps, to establish the same rules of construction, or define the kind and degree of evidence which will satisfy the requirements of the statute. To cite and review them all would be a needless task, as the general conclusions arrived at are well stated in the elementary works referred to, and others of equal authority. Every case, after all, must depend upon its own circumstances, and we must decide this case, not upon some particular feature of resemblance to this or that reported case, but upon the strength of its own undisputed facts, the circumstances by which the transactions were surrounded, and the application of those general principles by which courts of equity are governed in the exercise of a jurisdiction which reaches to the essence of

things, regardless of forms, which probes the conscience and compels it to respond to the duties of every trust legally established, as from its own promptings it would be inclined to do, if left undisturbed by those passions to which human nature, unhappily, is but too prone.

We have seen that the trust is not necessarily to be declared in writing, but only to be manifested and proved by writing, and if there be written evidence of the existence of the trust, the danger of parol declarations, against which the statute was directed, is effectually removed. Lewin on Trusts, *ubi supra.*

Is there in this case written evidence of the existence of a trust? There are but two items of that tendency: the letter and the will.

The circumstance that the letter was written by the grantee to his mother, and not to the person claiming to be *cestui que trust,* is not material. The letter is somewhat ambiguous in language, but it is clear that it relates to the subject. The grantee says: "I spent all the morning with Burnside yesterday. He states, as I told you, that Simon had made over the Chicago property that was held in his name, to me." The words "had made over" might mean as a donation, as a mortgage, or as passing a nominal title for the use of the grantor.

It appears, as an extrinsic fact, that at the date of the deed, Buckner held the nominal legal title for the use of the heirs, to some seventy-five feet fronting upon the Chicago river, which had been thus conveyed to him by his father-in-law; and it was claimed in argument that the letter simply referred to that parcel. It is conceded that the language of the letter standing alone would limit the reference to that parcel. The person referred to as "Simon," undoubtedly means Simon B. Buckner. The words, "had made over," had reference to some conveyance. The writer must, therefore, have intended, by these words, the making of a deed, covering Chicago real estate, to which Buckner was a party as grantor, and himself as grantee. As there never was any such deed but that made by Buckner and wife to him, of the date of May 15, 1861, we

must presume that that deed was the one intended by the words "had made over." That deed did in fact convey the parcel to which Buckner held the nominal title, but also all of Mrs. Buckner's interest in the property therein described, which was all of her father's estate in Chicago. The evident purpose of this peculiar allusion to the matter in the letter, with the reference to something which the writer had previously told her, was to admit the trust to her, but in such terms as that others might not understand it. At that time Buckner was in the military service of the so-called confederate States, and his wife within their military lines.

But there is another feature to the letter that must not be overlooked. After mentioning the fact that Burnside had stated to him, as he had told his mother, that Simon had made over the Chicago property, &c., he says: "A new power of attorney is therefore necessary for you and myself. We made one out. Burnside will send it to you. I send you a copy for your own keeping, and keep one myself." This power of attorney was so referred to in the letter, as to incorporate it as a part of the letter. Upon examination, it appears to relate to the entire Kingsbury estate in Chicago. By it Burnside is appointed attorney to transact all of the business of the estate, but restrained from disposing of any part of it, except to negotiate loans, under certain restrictions, and from making leases to extend beyond the term of three years. Now, if we are to assume that the letter had no reference to any of the estate, but the parcel of land held in Buckner's name, then, from the fact that the power of attorney gave Burnside control of the entire property, we must impute to him, an old and confidential friend of the family, and a man of high position and character, and to Henry W. Kingsbury, the only brother of Mrs. Buckner, upon the most affectionate and confidential terms with her and her husband, the wrongful and unnatural purpose of usurping control over Mrs. Buckner's share in her father's estate. This we will not do, because it is a more reasonable construction of these acts, and one far more just towards the

parties, to hold that reference was had to the deed of May 15. That deed purports to be a bargain and sale, but upon the nominal consideration of one dollar. Upon the question of establishing a trust against the title of a volunteer, which is not favored in equity, the statement of a mere nominal pecuniary consideration will not be allowed to affect the construction or operation of the deed. Hill on Trustees, sec. 107, top paging 148 ; *Young* v. *Peasly,* 2 Atk. 256.

It appears from the evidence, and is uncontradicted, that the grantee neither paid nor became responsible to pay, by any promise, express or implied, any valuable consideration whatever for the property conveyed. Upon the question under consideration, the fact of the deed being made *ex parte,* as appears was the case here, without communication with the donee, is a circumstance to which much attention will be paid. Hill on T. 108 ; *Cecil* v. *Butcher,* 2 Jac. & Walk. 573.

These facts and circumstances form legitimate ingredients of evidence, in reference to which, and the relative situation of the parties, the letter should be construed. If the grantee had purchased the property and felt the independence of a purchaser, would he not have placed himself in that character? Would he have used the unusual expression for such a relation, as that the grantor " had made over to him " the property ? On the other hand, did he regard the conveyance as a donation to him? Is it reasonable to suppose, under all the relations existing, that if he had received, or supposed he had, a gift from his sister and her husband, of real estate of the known value of half a million dollars, he would immediately, upon being satisfied of the fact, thus address his mother concerning so munificent a gift, without the slightest manifestation of either surprise or gratitude? Such a thing is against all our knowledge of human nature and experience in the affairs of mankind. Why should Mrs. Buckner desire or intend to give away this vast fortune to her brother, who had sufficient already, and to whom she was under no particular obligations, and retain for herself and her own children only the pittance

arising from the Waterbury property, of the value of less than four thousand dollars? No explanation has been attempted, and none, we apprehend, can be given. The circumstances all conspire to show, with irresistible force, that it was the intention of the parties at the time that Henry W. Kingsbury should take as trustee for one of the grantors, and not for his own benefit. And the language of the letter is a fair admission to that effect. It imports that the writer was not the real owner of the property. Then, as strengthening this position, we refer to the only other item of written evidence : the will, and so far as pertains to the present inquiry, it is immaterial whether that instrument was valid and operative as a will or not.

On the 25th of March, 1862, while Henry W. Kingsbury was at Fortress Monroe, in the State of Virginia, temporarily, in a military capacity, he wrote and signed with his own hand a will, by the first clause whereof, he declared that, " To my mother, Jane C. Kingsbury, I leave twenty thousand dollars, or so much of *my* Chicago property as, upon a fair appraisal, may be valued at that amount." By the second clause : " To my sister, Mary J. Buckner, I leave so much of *the* Chicago property *held in my name* as shall amount to one-third of the property in the city of Chicago left by my father, Julius J. B. Kingsbury, deceased." By the third clause : " To my cousin, John J. D. Kingsbury, I leave *my* property in Waterbury, Connecticut," &c. By the last clause he declared that: " The remainder of *my* property, of every description, I leave to my devoted wife Eva," &c.

There is little doubt but the making the portion devised to his sister one-third, instead of one-half, subject to his mother's right of dower, was the result of a misapprehension, arising from his youth and inexperience, and the manner in which the income had been previously divided. But it will be perceived that in the clause relating to the devise to his sister he uses the peculiar expression : " So much of *the* Chicago property *held in my name.*" Whereas, in the devise to his mother it is :

"So much of *my* Chicago property," &c.　To his cousin it is: "*My* property in Waterbury," &c.　To his wife : "The remainder of *my* property," &c.　It is an undisputed fact that the only Chicago property held in his name was that conveyed by the deed of May 15th.　Why this peculiarity of language, if he had not thereby reference to his sister's share thus conveyed?　And why say "*the* Chicago property held in my name," in that connection, unless in deference to the truth ? The expression excludes every idea but that of a nominal title, and is equivalent to saying "held by me in trust."　The deed of May 15 purports, as we have before said, to be a bargain and sale.　Is it not clear, then, from the letter and will, when viewed in the light of surrounding circumstances, that the agreement really made between the parties was not that stated by the deed?　We think it is, and that, therefore, there is written evidence of the existence of a trust, and the danger of parol declarations, against which the statute was directed, is effectually removed.　"If there is some written evidence inconsistent with the fact that the supposed purchaser was the actual purchaser, further evidence by parol is admissible to prove the truth of the transaction."　2 Sug. on Vend. (7 Am. Ed.) 911.

"When there is any written evidence that the person apparently entitled is not really so, that will open the door to the admission of parol evidence to prove the trust, notwithstanding the statute."　Hill on Trustees, 62.

The letter of the grantee makes reference to a particular parol declaration.　As there appears to have been but one occasion upon which he had before then made any declaration to his mother on the subject, *that* will be regarded as the one intended.　*Ghertrude* v. *Check*, 1 Adol. & Ellis, 57.　The declaration was made but a short time after the conversation between him and Buckner, as to the fact and purposes of the deed.　The latter had visited his mother-in-law in Connecticut, and had probably told her about it.　Then when Henry visited her in August or September, it was natural that she should

make inquiries concerning it. She did. She inquired of him whether his sister's property had been turned over to him, telling him that Simon had told her so. He replied "That is so, but don't look concerned ; it is only turned over to me for safe keeping ; it will be restored to her."

If there were no written evidence of the existence of a trust, and the letter were clear and unambiguous in its terms, we are inclined to think that, under the doctrine of reference to words, parol evidence would not be competent for the purpose of manifesting and proving a trust, as required by the Statute of Frauds.

In Virginia, it has been decided that a letter containing a promise to make a deed of a tract of land "according to contract," is a sufficient memorandum under the Statute of Frauds, notwithstanding the terms of the contract are not mentioned; provided the party claiming the conveyance can prove by the testimony of one witness the price which was agreed to be paid for the land. *Johnson* v. *Ronalds, Adm.* 4 Munf. 77.

The doctrine of this case seems to be contrary to the general rule of the English courts, they having required, unless under certain exceptional circumstances, that the reference be to some document in writing, though it has not been deemed indispensable that such writing be signed. *Clinan* v. *Cooke*, 1 Sch. & Lef. 32 ; *Hodges* v. *Hersfall*, 1 Russ. & Myl. 116 ; *Saunderson* v. *Jackson*, 2 Bos. & Pull. 238, and the same rule as to a contract for the sale of land, was followed by Chancellor KENT in *Parkhurst* v. *Van Cortlandt*, 1 Johns. Ch. R. 274.

Still it has been held that when a reference has been made to words by a will, the words may be proved by parol, not for the purpose of varying the terms of the will, or adding to its contents, but for the purpose of describing or defining what was meant. *Sanford* v. *Raikes*, 1 Merivale, 646.

" And in some cases of *trusts imperfectly expressed,* parol evidence has been held admissible in explanation of the intent. Thus, when a testator devised his estate to his wife, ' having a perfect confidence that she will act up to *those views which I*

*have communicated to her* in the ultimate disposal of my property after her decease,' the wife afterwards died intestate, and a bill was filed by his two natural children for relief against his heir and next of kin, and her heir and administrator, alleging that the testator, at the time of making his will, desired his wife to give the whole of his estate, after her death, to the plaintiffs, and that she promised to do so, parol evidence was admitted in proof of this allegation." 3 Greenl. Ev. sec. 365, p. 370, referring to *Podmore* v. *Gunning,* 5 Simon R. 485, S. C.; 7 Sim. 644.

It is not necessary to this case, and we do not commit ourselves to the doctrine of *Podmore* v. *Gunning,* to the full extent to which the learned author upon Evidence has accepted it; because the admission of parol evidence, in that case, may be consistently placed upon another ground, viz : that if a person obtains property under a will, upon a parol assurance that he will dispose of it in a particular way, the court will regard his attempt to keep the property, or dispose of it otherwise, as a fraud, and not allow him to set up the statute of frauds where a compliance with the statute would be to give effect to the fraud which it was intended to prevent.

From the best investigation we have been able to give to the question, and the authorities which bear upon it, we have arrived at the conclusion, that inasmuch as the written evidence clearly establishes the existence of a trust, parol evidence of the words referred to in the letter is admissible for the purpose of describing or defining what was meant by the letter, and as showing the truth of the transaction.

To search for artificial rules by which to exclude such evidence, beyond the just demands of the statute of frauds, would be an attempted reversal of some of the most favorite maxims of courts of equity ; would be the exercise of astuteness in the ways of defeating the plain intention of the parties, and aiding in the consummation of a fraud ; for, when a trust is once established by legal evidence, equity regards every attempt by the trustee to appropriate the trust property to

himself, to the exclusion of the rights of the *cestui que trust*, as a fraud, contemplated upon the latter.

The late Henry W. Kingsbury was, as this case shows, not only a trustee of the property, for his sister, but he was an honest trustee. By the last act of his life, in this respect, he designed to, and did, admit the existence of the trust, and endeavored to execute it. Immediately after his death, his widow, one of the defendants, in a letter to the mother of her deceased husband, recognized and admitted the trust, so far as she was concerned, in the most express terms, and seemed distressed at the suggestion of any obstacle to its immediate execution. Though her relations in life, and to the *cestui que trust*, became afterwards changed by another marriage, yet it is incredible that if she has been cognizant of the efforts which have been made to conceal the most important item of evidence of her former husband's relation to this vast property, and to wrest it from its proper channel, she can view them otherwise than with feelings of sorrow and regret. Her conduct has been the subject of severe criticism by counsel, but we are inclined to believe that she, like the unconscious infant whose name appears as plaintiff in the original bill, is but the involuntary instrument in the hands of designing men, who stand in no such relation to the memory of the deceased trustee as does Eva Lawrence.

The trust being sufficiently manifested and proved by writings, signed by the party who was, by law, enabled to declare it, it must be executed.

This conclusion renders unnecessary any discussion of the question, made by appellants in the cross bill, as to the sufficiency of the acknowledgment of the deed by Mary J. Buckner, or of the question made by appellant in the original bill, as to the execution and probate of the will; because, if properly executed and admitted to probate, the will would be governed by the laws of this State, where the property is situated; and the posthumous birth of the infant Henry W. Kingsbury, would, by those laws, operate as an abatement of

all devises of property so situated. Gross' Statutes, p. 800, sec. 16, Wills. Besides, the testator was incapable of divesting the property held in his name, for the use of Mary J. Buckner, by any devise he could make.

The decree of the court below, dismissing both bills without prejudice, must therefore be reversed and the causes remanded, with directions to that court to dismiss the original bill absolutely, and to grant the relief prayed in the cross bill, by a decree establishing the equitable title in Mary J. Buckner, to her proper share of the real estate described in the deed of May 15th, 1861, declaring the trust, and requiring the proper conveyance of the legal title to her, divested of any life estate in her husband, (he having renounced the same,) and of all right of dower in Eva Lawrence ; that an account be taken between said Mary J. Buckner and all other parties interested in the estate of Julius J. B. Kingsbury, deceased, according to the rules and practice of the court of chancery in such cases, and it be decreed accordingly.

*Decree reversed.*