ELGIN NATIONAL WATCH CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 19522.   Promulgated September 19, 1929.

John E. Hughes, Esq., Alfred T. Carton, Esq., and Flay L. Murphy. C. P. A., for the petitioner.

Brooks Fullerton, Esq., and F. R. Shearer, Esq., for the respondent.

342

344

346

352

## OPINION.

ARUNDELL: In his determination of petitioner's tax liability for the taxable year, the respondent not only taxed it on the net income of the two pension funds, amounting to $5,886.30, but disallowed as deductions for ordinary and necessary business expenses the cost of the securities assigned to the trustees of the funds, totaling $270,029.61; the cash payment of $39,970.39 to the special fund; and the item of $25,000 accrued on its books April 30, 1919, for liability as a contributor to the general fund. The respondent's action in each instance was based upon the ground that the instruments establishing the funds created not a taxable entity separate from the petitioner, but merely an agency forming a part of its business.

In *Orr* v. *Yates*, 209 Ill. 222; 70 N. E. 731, the Supreme Court applied the following test for determining whether the instrument before it created a trust:

It may be conceded that the declaration of a trust must be reasonably certain in its material terms, and that this requisite of certainty includes, first, the subject-matter of property embraced within the trust; second, the beneficiaries or persons in whose behalf the trust is so created; third, the nature and quantity of interests which they are to have; and, fourth, the manner in which the trust is to be performed. If the language is so vague, general, or equivocal that any one of these necessary elements of the trust is left in real uncertainty, the trust must fail, or, if any one of the three things necessary to constitute a trust is wanting (that is, first, sufficient words to raise it; second, a definite subject; and, third, a certain or ascertained object), the trust will fail. It is not practicable to adopt any specific definition of a trust which can be applied in all cases. Many attempted definitions are to be found in

the textbooks and decided cases, but is unimportant here to accept one rather than another. All must agree that it is not necessary to the validity of a trust that every element necessary to constitute it must be so clearly expressed in detail in the instrument creating it that nothing can be left to inference or implication. No particular form of words are necessary, but, language of the instrument and the terms employed, such intention will be supported by the courts. *Fisher* v. *Fields*, 10 Johns. 495; 2 Story's Eq. Jur. § 980; *Hagan* v. *Harney*, 147 Ill. 281, 35 N. E. 219.

The court in *Osborn* v. *Rearick*, 325 Ill. 259; 156 N. E. 802, said:

Any agreement or contract in writing made by a person having the power of disposal over property, whereby such person agrees or directs that a particular parcel of property or a certain fund shall be held or dealt with in a particular manner for the benefit of another, in a court of equity raises a trust in favor of such other person against the person making such agreement. 1 Perry on Trusts, §82; *Whetsler* v. *Sprague*, 224 Ill. 461, 79 N. E. 667; *Fox* v. *Fox*, 250 Ill. 384, 95 N. E. 498. If the writing makes clear the existence of a trust, if it states a definite subject and object, it is not necessary that every element required to constitute it must be so clearly expressed that nothing is left to inference or implication. *Orr* v. *Yates*, 209 Ill. 222, 70 N. E. 731. "If the writing makes clear the existence of a trust, the terms may be supplied aliunde." *Kingsbury* v. *Burnside*, 58 Ill. 310, 11 Am. Rep. 67; *Cagney* v. *O'Brien*, 83 Ill. 72.

To the same general effect see the citations in *Hibbard, Spencer, Bartlett & Co.*, 5 B. T. A. 464.

Each of the instruments creating the pension funds provides that the contributions of the contributors are to be held by the trustees under definite conditions for the benefit of certain specified persons. Petitioner ceased to have any beneficial interest in amounts contributed by it as soon as it made a payment except the possibility of a reversion upon the liquidation of the trusts at some indefinite time in the future.

Throughout the taxable year the trusts functioned in accordance with the terms of the instruments. The trustees received the income from the securities and cash held by them, paid sums to pensioned officers and employees of petitioner as provided for in the trust agreements, and sold some of the securities at a loss.

The respondent cites *N. H. Boynton*, 11 B. T. A. 1322, as being a case having facts more analogous to those obtaining here than the *Hibbard* case, *supra*, relied upon by petitioner. We not only think the *Boynton* case has many distinguishing facts, but are of the opinion that the reasons for holding here that valid trusts exist are as persuasive, if not more persuasive, than they were in the *Hibbard* case.

Applying the rules of law applicable to the creation of trusts to the facts before us, we conclude that all the requisites of a valid trust are present. From this conclusion it necessarily follows that the

respondent erred in taxing petitioner on the net income of the two trusts. *Hibbard, Spencer, Bartlett & Co., supra.*

The respondent contends that in case we hold that valid trusts exist we should not allow a deduction for the securities contributed to the funds or the accrued item of $25,000. As to the initial contributions of $100,000 par value of Liberty bonds to the general pension fund, the respondent argues that it should be treated as in the nature of a capital expenditure, and as to the securities contributed to the special fund, his contention against their deductibility is based upon the theory that petitioner did not part with any right or title in the principal of the assets.

We are unable to agree with the view expressed that the contribution of Liberty bonds to the general pension fund should be considered a capital expenditure and not a business expense. The transfer to the securities to the trustees of the fund operated to divest the petitioner of all its right, title and interest in the bonds except a reversionary interest. Thereafter the trustees had the custody and control of the securities and were entitled to receive the profits therefrom for the purposes of the trust. The transaction did not result in the acquisition of an asset for use in petitioner's business for several years, but actually reduced its resources. While it can not be doubted that the petitioner derived a benefit from the expenditure, it is not one which should be capitalized.

In *Hibbard, Spencer, Bartlett & Co., supra,* we held that the payment made to a fund for the purpose of paying pensions to retired employees was reasonably connected with the taxpayer's business, and it having been stipulated that the payment did not make the total compensation of each employee unreasonable in amount, the contribution was allowed as a business expense. No contention is being made here that the contributions of Liberty bonds when added to the wages and salaries paid during the taxable year made the total compensation to petitioner's employees unreasonable in amount, and because of the small amount involved in comparison with the total wages and salaries paid to active employees during the taxable year, the figure being about 3 per cent, we see no reason to question it.

What we have said concerning the contribution of Liberty bonds to the general pension fund applies to a considerable extent to the payments of securities to the special fund, created and managed for the benefit of employees to whom petitioner had been paying pensions. As we have heretofore pointed out, the only interest the petitioner retained in any of the securities transferred was a reversionary interest. Until the liquidation of the trust in the manner provided for, the trustees were entitled to receive the benefits of the securities free from any interest therein of the petitioner.

In addition to the cost of the securities and cash paid to the trustees, the petitioner is claiming as a deduction from gross income, the sum of $25,000 accrued on its books at the close of the taxable year under its liability to contribute annually to the general fund an amount equal to the payments of its officers and employees. By the provisions of section VIII of the rules and regulations adopted for the operation of the fund the liability of the petitioner to make annual contributions was not to commence until one year from the date of the initial payment and could be paid any time within the current year. The initial payment of Liberty bonds was made on October 24, 1918, less than one year prior to April 30, 1919, the date on which the liability was accrued on the corporate books. It is quite obvious that since the petitioner's liability to make annual contributions to the general fund was not to become effective until October 24, 1919, no part of the amount in question accrued during the taxable year.

There remains for decision under this issue the question of whether the deduction for the securities should be on the basis of cost or market value at the time of their transfer, there being proof that the market values of the bonds were less than their cost. The petitioner failed to prove the market value of the stock.

The issue as presented to us for decision is broad enough to allow the petitioner a loss on such of the securities as had a market value of less than cost and to increase its income by the amount of any excess of market value over cost. Because of this condition it is not necessary for us to decide whether the deduction should be measured by the cost or market value of the securities, since the final result would be the same, regardless of the basis we adopted to compute the deduction.

The cost of the securities transferred to the funds, amounting to $270,029.61, and the cash payment of $39,970.39, a total of $310,000, are deductible from gross income in the taxable year as ordinary and necessary expenses. See *Hibbard, Spencer, Bartlett, & Co., supra*, and *Live Stock National Bank*, 7 B. T. A. 413.

In fixing the cost of petitioner's inventory of goods in process and finished goods on hand at the close of the taxable year, the respondent included an undisclosed portion of the bonuses paid during the year as being allocable to the cost of such goods. It appears that there is no dispute about the actual amount included. Petitioner contends that since in many instances the labor for which the bonuses were paid had played its part in the production of goods prior to the issuance of the several bonus announcements, no part of the bonuses should be included in the cost of the inventory.

The bonus announcements introduced into the record clearly show that part of the bonuses paid in the taxable year was for services

performed by employees during that period in the production of the goods in the inventory, and no evidence was offered to show that the amount paid for such services was different from that determined by the respondent. On this issue the respondent is sustained.

While a great deal of evidence was introduced into the record to show the expenditure of large sums of money prior to the taxable year for the development and construction of capital assets, such as good will, trade-marks, patents, small factory buildings, etc., it fails to prove that any specific amount charged to expense should be restored to capital. In their brief counsel for the petitioner do not claim to have proved the exclusion from invested capital of any definite sum. In these circumstances we decline to disturb respondent's determination of invested capital.

Two of the three witnesses whose depositions petitioner introduced into the record expressed the opinion that Patent No. 1,020,832 had a fair market value on March 1, 1913, of $150,000. The other witness testified that the patent had a value on that date of not less than $100,000. The latter witness failed to show sufficient experience in the valuation of property of this character to entitle his opinion to weight. Another witness, G. V. Dickinson, an officer of the petitioner corporation for many years, frankly admitted that if he had been called upon on March 1, 1913, to value the patent as of that date, he could not have done so. The remaining witness on this question displayed some experience in the sale of patents of an undisclosed character. This valuation of the patent was, however, predicated almost entirely upon the sales of watch parts and movements after March 1, 1913, and the use of the patented device by 5,000 jewelers in connection with the repair of watches of Elgin and other manufacture. The evidence is that not more than 1,000 of the gauges were distributed prior to March 1, 1913. No proof was made that there were 5,000 of the gauges in use at any time after the basic date or that all or any portion of the sales of watch parts and movements were directly attributable to the patent, and, if so, that they could have been reasonably anticipated on March 1, 1913. On the record as made it is our opinion that the respondent must be sustained on this point.

Petitioner is claiming exhaustion on Patent No. 1,096,304, issued May 12, 1914, on an application therefor filed July 23, 1912, based upon a March 1, 1913, value of the application of $50,000. The opinion of the witness, Hansen, who testified to this value is not supported by any facts as to the effect the invention would have, or had, on future sales of watch movements; the extent to which the invention was an improvement in the art; public demand for watch movements covered by the application; whether the invention enabled petitioner to reduce the production cost of its product, and, if so, the

amount, or any other pertinent facts to enable us to test the accuracy of his judgment. Furthermore, the witness has not shown any special knowledge of the watch business, such as the petitioner is engaged in, or any particular knowledge of values to be attached to improvements in the mechanism of watch movements. Under these circumstances we must decline to accept the witness' opinion as proof of the value on March 1, 1913, of the patent application.

The petitioner's argument in favor of the allowance of the sum of $18,526.90 paid to the Keystone Watch Case Co. on account of income taxes assessed by Great Britain as a credit against income and profits taxes due the United States, instead of as a deduction from gross income, is based upon the theory that the latter company paid the taxes as its agent.

Section 238 (a) of the Revenue Act of 1918 provides, in part, that there shall be credited against taxes imposed by its provisions, the amount of any income, war-profits and excess-profits taxes paid to a foreign country upon income derived from sources therein. Section 200 of the same act provides that the term "paid" for the purpose of credits, means "paid or accrued" or "paid or incurred."

The petitioner made no attempt to prove the foreign law under which the taxes were assessed or the time of payment of the taxes. Without proof of these facts we are unable to determine whether the taxes accrued or were paid in the taxable year so as to bring the item within the provisions of section 238 (a) of the taxing act.

We are unable to agree with the conclusion of petitioner that the contract of March 31, 1904, pursuant to the terms of which the taxes were paid, appointed the Keystone Watch Case Co. as agent for the sale of complete watches in foreign countries. The purpose of the instrument was to create an arrangement for the sale in foreign countries of · watch movements manufactured by petitioner and watch cases manufactured by the Keystone Watch Case Co., combined as a complete watch, by the latter company, the selling expenses to be borne by the respective parties according to the proportions set forth in the agreement. That this business was to be carried on by the Keystone Watch Case Co. in its individual capacity and not as· agent for the petitioner seems clear from a provision in the preamble to the agreement that "the export business wherein the product of both of the parties to this agreement combined as complete watches should be conducted exclusively by the party of the second part." The statement attached to the deficiency letter shows that the taxes were not assessed against either the petitioner or the Keystone Watch Case Co., but against the Keystone Watch Case Co., Ltd., a foreign corporation, the stock of which was owned by the latter company. It therefore appears that the taxes were paid in the first instance by the Keystone Watch Case Co., Ltd., a corporation whose business con-

nection, if any, with the petitioner has not been shown. We find no error in the respondent's treatment of the item as a business expense instead of a credit.

The remaining issue is whether petitioner is entitled to special assessment.

. Proof was made that in the year 1870 and for the years from 1876 to 1918, inclusive, there being no record of the amount spent during the years 1871 to 1875, petitioner expended in its business a total of $2,255,977.33 for advertising to bring about immediate as well as future sales, and in addition thereto expended about $525,000 from 1880 to 1916, inclusive, for salaries and expenses of traveling men engaged in calling upon retail jewelers, not for the purpose of making direct sales, as the petitioner sold its watch movements exclusively through jobbers, but to acquaint them with the advantages of handling Elgin watches as compared with watches of other manufacture, and otherwise inform them of its product. Prior to the taxable year, the petitioner also replaced, free of charge, watches damaged beyond repair by the San Francisco fire and earthquake, and certain floods at Dayton, Ohio, and in Massachusetts. All these advertising and watch replacement costs were charged to expense.

There can be little, if any, doubt that these expenditures, representing a substantial sum, resulted in the acquisition of an intangible asset from which the petitioner reaped a benefit in future years. This fact is illustrated by the sales of petitioner, which, in 1917, were considerably in excess of those for any prior year.

There is no competent evidence before us from which to determine what part of the total amount expended to create current sales and future business should be treated as a capital expenditure, and accordingly included in invested capital. This condition brings the case within the rule announced in *Northwestern Yeast Co.*, 5 B. T. A. 232. See, also, *Mead Cycle Co.*, 10 B. T. A. 887, and *George W. Casewell Co.*, 14 B. T. A. 15.

During the taxable year the petitioner owned and used in the conduct of its business, four valuable patents. The cost of developing these patents was charged to expense and because of the manner in which petitioner kept its books, it is not possible to make an accurate determination of the amount of such cost.

No consideration other than their regular salary for performing their customary duties was paid to employees for developing trade-marks and trade names. These costs, as well as the fees charged by attorneys for registering the trade-marks and trade names, were charged to expense after January 1, 1901, and their amount can not now be determined.

About 90 per cent of the machinery used by the petitioner was designed, constructed, and installed by its employees. The portion of the total cost capitalized did not include any charges for drafting, or for experimenting, developing, installing, or " tuning up " work, or overhead. The cost of installing the machinery can not be determined, and because of the absence of this cost, there is no basis for fixing the amount of overhead properly chargeable thereto. Inability to determine accurately the cost of machinery used, as here, in the production of a material part of income, is, as we held in *Akron Rubber Mould & Machine Co.*, 12 B. T. A. 1252, ground for allowing special assessment. All or part of the cost of many other capital items, including plates for making watch dials, factory fixtures and small factory buildings, was charged to expense. A large part of the cost of acquiring these capital assets, all of which had their part in producing income, can not be determined.

From a consideration of all the facts of record we are of the opinion that petitioner's invested capital can not be determined under the provisions of section 326 of the Revenue Act of 1918 and that it is entitled to have its tax liability determined under the provisions of section 328.

Reviewed by the Board.

*Further proceeding will be had under Rule 62 (c).*