JOHN FRED WILENOU

*v.*

ANNA HANDLON *et al.*

*Opinion filed February 17, 1904.*

1. DEEDS—*recording of deed not conclusive evidence of absolute delivery.* The recording of a deed by the grantor is not conclusive evidence that he then delivered the deed absolutely or that he intended it to take effect at once.

2. SAME—*what does not show that deed was delivered absolutely.* Evidence that the grantor executed and recorded a deed without the knowledge of the grantees, his adult children, until he brought it home, when he handed it to one of the grantees, telling her to put it with his papers where it would be found after his death, does not show delivery with intention of at once vesting title.

3. SAME—*presumption of delivery to adult child not as strong as in case of minor.* The presumption of delivery of a deed from parent to child, arising from its execution and recording, does not obtain in favor of adult children to the same extent as where the children are minors.

4. SAME—*fact that grantor continued in possession of farm is against presumption of delivery.* That the grantor continued in the possession of the farm after the execution and recording of a deed to his daughters, dividing the profits from the farm with them as he had done before, tends to show that the delivery of the deed to one of his daughters to place among his papers was not intended to vest title in them at once.

5. SAME—*grantor must have notice of the acts of ownership to be bound thereby.* Where father and daughters reside as a family upon the farm after he executes a deed to them, the fact that the land was assessed and insurance policies were issued in the daughters' names is not binding upon the father as a recognition of their title without proof that he knew and consented to such acts.

APPEAL from the Circuit Court of Grundy county; the Hon. S. C. STOUGH, Judge, presiding.

This is a bill in chancery filed by appellant in the circuit court of Grundy county against his three daughters, Elizabeth Wilenou, Paulina Wilenou and Anna Handlon, and William Handlon, husband of Anna, to cancel and set aside as a cloud upon his title the record of a deed bearing date February 18, 1899, executed by the appel-

lant to his said daughters, and purporting to convey to them his farm, containing four hundred and forty acres, located in said county, which deed was recorded in the office of the recorder of deeds of Grundy county on the 20th day of February, 1899.    Elizabeth and Paulina disclaimed any interest in the farm, and Anna and her husband filed an answer denying the allegations of the bill, and averring that Anna was the owner of an undivided one-third part thereof.    A replication was filed, and the case was referred to the master to take proofs and report his conclusions as to the facts and the law.    A report was filed by the master, in which it was found that Anna was the owner of the undivided one-third part of the farm in fee, and objections and exceptions having been filed thereto and overruled, a decree was entered finding that Elizabeth and Paulina, by reason of their disclaimer, had no interest in the farm and decreeing Anna to be the owner of the undivided one-third part thereof in fee, and as to her dismissed the bill for want of equity, from which decree appellant has prosecuted an appeal to this court, and has assigned as error the finding of the court that Anna was the owner of the undivided one-third part of said farm in fee and in entering a decree dismissing the bill for want of equity as to her.

It appears from the pleadings, proofs and master's report that appellant is a German, was a widower, and was about seventy years of age at the time of the execution of the deed sought to be canceled; that he came to America when a young man; that many years ago he purchased the farm in question, which was not the best quality of soil but was adapted to the raising of stock and upon which he and his family made their home; that by industry and economy, with the assistance of his wife, he improved and paid for the same and raised his family, which consisted of five girls: the defendants; a married daughter who died several years prior to the execution of the deed, leaving five small children, who had had

a home, since their mother's death, with the appellant;
and another married daughter, who married a man by
the name of Allen Spellman, and who resides in Coal
City, not far from said farm; that subsequent to the time
of the death of appellant's wife, which occurred some ten
years prior to the date of the deed, the defendants were
the house-keepers of the appellant; that the appellant
disliked his son-in-law, Spellman, and said he should
have none of his property; that appellant had been in
poor health, and a short time prior to the execution of
the deed he seems to have been impressed with the fact
that he might soon die, and on one or two occasions
talked with his three daughters about making a dispo-
sition of his property in view of that fact. He testified
he told his three daughters that he wanted the farm,
upon his death, divided equally between them, and that
they should take care of the children of his deceased
daughter, and if any one of said daughters married she
was to have $1000 in cash at the time of his death and
have no interest in the farm; that some six weeks prior
to the execution of the deed the appellant met Patrick
Howard, whom he had known for thirty years, on the
street in Coal City. Howard testified: "I met him and
shook hands with him, and I says, 'Fred, how are you
getting along now?' and he says, 'I am not getting along
good; I am filling up here and can hardly breathe.' He
seemed to be laboring for his breath, and he says, 'I
think I would be all right on account I get my property
settled before I die,' and I says, 'Why don't you make a
will?' and he says, 'I don't like wills; afraid of trouble
afterwards.' 'Well,' I says, 'Fred, now my father is gone
and our property was willed, and it has gone through
the probate courts and has cost considerable money, but
if I had property I should deed it as I wanted it to be,'
and I do not know just what answer he made, but in a
very short time after that, the very first thing I saw in
the paper was this transfer."

On the day the deed was executed the appellant was in Coal City. While passing a saloon he says he heard his son-in-law, Spellman, say, "I saw my old father-in-law and he looks bad, and I think he will kick the bucket soon." He immediately went to the office of Joseph Campbell, a notary public in Coal City, and Campbell drew the deed in question and appellant executed it. Campbell testified: "My impression was that he was pretty sick at the time he came to my office. I do not think I knew the nature of his ailment. I do not know as I remember exactly what was said. My impression was that he wanted to have a deed to take the place of a will. He didn't expect to live long at that time, and after his death he wanted the property to go to the grantees therein. Neither of the grantees was there,—just himself. I think I have heard him say that Mr. Spellman, his son-in-law, should not participate in the disposition of his estate. About the time he made the conveyance was when I heard him make such a remark."

After the deed was executed it was sent by Campbell to the county seat and recorded and then returned to Campbell, when the appellant called and it was delivered by Campbell to him. He said nothing to either of his daughters about having made the deed until after it had been recorded and returned to him by Campbell. When he reached home with the deed he gave the deed to one of his daughters and told her to put it with his papers, and she put the deed in the bureau drawer with the other papers of the appellant, where it remained until this suit was commenced.

Elizabeth testified: "I had a conversation with father about the disposition of his property in case of his death. He said he was going to make a deed to us children. He said he was going to make a deed over to his children. We were to have it when he died. I know he did make a deed to the three girls, Elizabeth, Anna and Paulina. I remember him bringing it home.

Q. "What was done with the deed at that time?

A. "Gave it to me and told me to put it among his papers.

Q. "And what did you do with the paper?

A. "I put it away.

Q. "Did you ever see the deed after that?

A. "No, sir.

Q. "Does he have a certain place where he keeps all his papers?

A. "Yes, sir.

Q. "Referring back to the time he mentioned about making this deed, can you recall anything else that was said at that time about who was to have the property?

A. "He said his children would have the property.

Q. "When were they to have it?

A. "After death.

Q. "Was anything further said about their leaving the home?

A. "He said that the one who would leave home was to have $1000 after he was dead.

Q. "And what was to become of the property?

A. "We were to have it and keep the grandchildren together—his grandchildren.

Q. "You may state whether or not, if anything was ever said as to when you were to have the property.

A. "We wasn't to have it until after father died."

Paulina testified: "In the fall father's health was pretty good, but later in the winter he had poor health and the latter part of the winter was under the doctor's care, and he thought he wouldn't last very long. He talked this over at home before sister Anna and myself. I think it was in January that he first talked about making the deed. He said he would give the property to us three. We were to take care of the grandchildren, and if one of us left home before he died we were only to get $1000. All three were present. Father afterwards made a deed. I do not know the date of it.

Q. "Do you know what he did with it?

A. "He brought it home, and we three were in here, and he said: 'Here is the deed, and I have fixed it so you three will have the property.   Put it among my papers, so you will know where it is if I should die suddenly.'

Q. "To whom did he hand the deed?

A. "He handed it to my sister Elizabeth.

Q. "Do you know what she did with the deed?

A. "Put it in a drawer among his papers.

Q. "Did he ever give the deed, to your knowledge, to your sister Anna?

A. "No, sir; he never did.

Q. "Did you or your sister Elizabeth or Anna ever have possession of the deed?

A. "No, sir."

The appellant testified:

Q. "How did you come to have the deed recorded?

A. "Campbell was thinking it was better.

Q. "Did anybody tell you to have it recorded?

A. "Campbell told me it would be better; that the way I was I might die in a day or two.

Q. "When you took the deed home, to which one of the girls did you hand it to?

A. "I think I handed it to two of them.   I wanted to take my coat off and lay right down.   They took it and put it among my papers and I afterwards found it there. I have had it all the time since. They could get to it, for I never had anything locked up.

Q. "At the time you had the deed made and the same placed upon record, did you intend to pass the present estate to the children?

A. "Not as long as I lived.

Q. "When you took the deed home, did you deliver it to either or any of the girls with the intention of giving them the farm at that time?

A. "No, sir.

Q. "Did you at that time deliver the deed to either of them?

A. "No, I just handed it to them and told them to throw it in my papers, and I took my coat off and lay down.

Q. "Since the 18th of February, 1899, have you been in possession of this farm?

A. "Yes, sir.

Q. "Did you ever deliver the possession of the farm over to the girls?

A. "No, sir."

At the time the testimony was taken before the master, Elizabeth was forty-two, Anna thirty-nine and Paulina thirty-years of age. They all had worked in and about the home, at times doing the work of men upon the farm, and after the mother's death shared in a part of the profits of the farm with the father. Anna had received superior educational advantages to those of her sisters and taught in the public schools of Grundy county for ten years. There was no apparent change in the possession of the farm after the deed was executed and no change in the manner of conducting the same. In the year 1901 Anna married Handlon, very much against the wishes of her father. Her marriage displeased him greatly. Prior to her marriage he said to her if she married Handlon she would get nothing from the farm. She replied, all she wanted was what she had earned teaching school, and she took with her from $1800 to $2000 in money when she left home. Shortly after her marriage the appellant asked her to release to him any apparent interest which she might have in the farm by reason of the deed having been made a matter of record, which she declined to do, and the bill was then filed.

The appellant, after the deed had been made, told different persons he had deeded the farm to the girls, and after the deed was recorded the land was assessed in the names of the girls, and at least one tax receipt was taken

in their names. The insurance was renewed upon the buildings after the deed was executed and a new insurance policy was taken in the names of the girls. It does not appear, however, that the land was assessed and the insurance renewed in the names of the girls by the direction of the appellant.

E. L. CLOVER, for appellant.

CORNELIUS REARDON, for appellees.

Mr. CHIEF JUSTICE HAND delivered the opinion of the court:

The main question presented here for determination is, did the appellant deliver the deed executed by him on February 18, 1899, to his three daughters, or to one of them for the benefit of all, with the intention that it should then take effect and the title to said farm immediately vest in them, or was the deed in the nature of a testamentary disposition of the farm? That is, did the appellant intend the deed should not take effect and the title to the farm vest in his daughters until after his death? The deed was recorded by him, but that is not conclusive evidence that he then delivered it absolutely or that he intended it to at once take effect. When the deed was executed the grantees were not present. Neither did they have any knowledge of the fact that it had been executed until after it had been recorded. The first time they received notice that the deed had been executed was when the appellant brought it home with him. He then gave it to one of his daughters and told her to place it among his papers, where it could be found in case of his death. Anna testified, when her father brought the deed home with him he gave it to her and Elizabeth, and said: "Here is the deed; now you take care of it." We think the weight of the evidence strongly preponderates in favor of the appellant's contention that he did not

deliver the deed to his daughters with the intention that it should then vest in them the title to the farm.

In the case of *Brown* v. *Brown*, 167 Ill. 631, a bill was filed by the father to cancel, as a cloud upon his title, a deed which he had executed to his son and caused to be recorded. On page 636 it was said: "It is true, the deed was placed upon record; but that fact, of itself, does not establish a delivery of the instrument. If a grantor, without the knowledge or assent of the grantee, place a deed on record, that will not constitute a delivery, for the reason the grantee has not assented to receive the deed, and it is well settled that it is essential to the legal operation of the deed that the grantee assents to receive it. Without acceptance on behalf of the grantee there can be no delivery. (*Herbert* v. *Herbert*, Breese, 354; *Kingsbury* v. *Burnside*, 58 Ill. 310; *Maynard* v. *Maynard*, 10 Mass. 458; *Sullivan* v. *Eddy*, 154 Ill. 199.) Here, from all the evidence, it is apparent that the grantor himself placed the deed on record, and after it was recorded he retained the possession and control of the instrument, and if at any time the deed passed out of his possession the act was without his consent, and hence did not affect his rights. *Wormley* v. *Wormley*, 98 Ill. 544."

If the deed was intended by the appellant to operate as a will, and not as a deed, it was not delivered. In *Hayes* v. *Boylan*, 141 Ill. 400, Patrick Boylan executed a deed to a piece of real estate to his three sons. He handed it to one of them with instructions, "Take this deed and put it in the box in the bank." He further said, "The boys need not know anything about this till after my death." The circuit court held the deed was delivered, but this court reversed its decree, and on page 406 said: "It is plain that the intention of Patrick Boylan was to have the deed to take effect only after his death. On its face the deed purported to operate presently, but he intended to, and did, retain the possession of the land and received and enjoyed its rents during his life. He

did not deliver the deed *in escrow* to a third party, with direction to him to deliver it to the grantees therein named after his death, but he retained its possession himself until his death, intending that it should become operative only after that event,—in other words, he intended it should operate precisely as a will without having it executed and witnessed as a will."

It has been held, if a parent execute a deed to an infant child which is beneficial to the child, and manifests by his words and acts that he intends the deed shall operate at once, a delivery will be presumed and proof of actual delivery is unnecessary. This is because the infant is incapable of doing any act in regard to the deed which he may not avoid on reaching his majority, and it is the duty of a parent, as his natural guardian, to accept and preserve the deed for him. (*Hayes* v. *Boylan*, *supra*.) The grantees here were all of age, and the presumption of delivery in their favor does not obtain,—at least to the extent it would if they were minors; and if such presumption did obtain, the circumstances under which this deed was executed and recorded, and the fact that it was retained by the grantor and placed by one of the grantees, by his direction, among his papers, with the view that it might be readily found in case of his death, rebuts the presumption of delivery.

In *Cline* v. *Jones*, 111 Ill. 563, Cline went alone before a justice of the peace and had drawn up and signed and acknowledged, a warranty deed of the land in controversy to Mrs. Jones, his daughter, the deed reciting it was made in consideration of love and affection and one dollar. He told the justice he had given all his other children land but none to Mrs. Jones, and he felt he ought to give her said land. After he had executed the deed he told many persons that he had made the deed; that he had made his children equal; that Mrs. Jones would have the land upon his death. He also said to Mrs. Jones and her husband he had fixed it so that the

207—8

land would be hers at his death, but if she would move on the land it should be hers immediately. That she did not do. He retained the possession of the deed until his death, also the possession of the land. It was held the deed was not delivered and for that reason it did not convey the title. It was there said (p. 569): "The deed by its purport was absolute, conveying the grantor's entire interest, to operate immediately. But the evidence shows the deed was not intended to be absolute, but to be qualified in its effect; that it was not intended to convey the grantor's whole interest, but that he meant to have a life estate unless the grantee should move upon the land, which she never did; that the deed was not intended to operate presently, but only upon the grantor's death or going upon the land to reside. The evidence shows the distinct intention not to create a present estate in the grantee. As, then, there was never any actual delivery of the deed but the grantor ever kept it in his own possession, and as it never was his intention that the deed should presently take effect and become operative according to its terms, there was no delivery of the instrument as the deed of the grantor, and it was not valid as a deed."

Mr. Lewin, in his work on Trusts, on page 124 quotes from the case of *Habergham* v. *Vincent,* 2 Ves. Jr. 203, as follows: "A deed must take place upon its execution, or not at all. It is not necessary for a deed to convey an immediate interest in possession, but it must take place as passing the interest to be conveyed at the execution; but a will is quite the reverse, and can only operate after death." The author then proceeds: "We may therefore safely assume as an established rule, that if the intended disposition be of a testamentary character and not to take effect in the testator's lifetime, but ambulatory until his death, such disposition is inoperative unless it be declared in writing, in strict conformity with the statute enactments regulating devises and bequests."

The evidence in this case also shows that the appellant remained in the possession and was in the possession of the land at the time he commenced this suit. The fact that the grantor remains in possession of the land after the deed is made is considered and commented upon in all the decided cases as an important fact in determining whether a deed for land made to a party out of possession has been delivered. The facts of this case are peculiar. The grantor was old and infirm and his daughters resided with him. They often did the work upon the farm usually performed by men. He advised with them as to whom the land should be rented to when rented, and divided with them the income of the farm,— that is, the profits arising from the grain and hay raised on the farm and stock raised and sold from the farm,— before and after the execution of the deed. The fact that the land was assessed in the names of the girls and an insurance policy was written upon the buildings in their names, if the assessment was made and the policy written without the knowledge or assent of the appellant, would not bind him. If the appellant was to be bound by such facts, the burden of proof was upon Anna to show that he knew of such facts and assented thereto. This she failed to do. The fact that the appellant stated to different persons that he had made a deed of the farm to the girls is not inconsistent with the view that he intended the deed to take effect only upon his death.

We have examined this record, which is voluminous, with care, and are fully convinced that the appellant did not intend to transfer by said deed to his three daughters, absolutely, said farm, which represents the accumulations of a lifetime and which transfer would have left him almost penniless, as it is conceded the farm was substantially all he had and the deed was without any valuable consideration, but are confident, in view of what appellant supposed was approaching death, he sought by said deed to make a disposition of his property which

would place the title in his three daughters ·after his death.

The decree of the circuit court will be reversed and the cause remanded to that court, with directions to enter a decree in favor of the complainant and against all the defendants, in accordance with the prayer of the bill of complaint.

*Reversed and remanded, with directions.*