ELIZABETH C. PHELPS *et al.*

*v.*

LORENZO PRATT.

*Opinion filed December 22, 1906—Rehearing denied Feb. 6, 1907.*

1. DEEDS—*deed procured without delivery may be ratified.* A deed handed by the grantor to one of the grantees with directions to put it in the grantor's desk and not record it, but which is immediately filed for record by such grantee, may subsequently be ratified by the grantor with full knowledge of the facts, so as to vest a good title in the grantees. (*Wilenou* v. *Handlon,* 207 Ill. 104, and *Hayes* v. *Boylan,* 141 id. 400, distinguished.)

2. SAME—*what tends to show ratification of deed.* The signing by a grantor of an application for renewal of a loan on the property, stating that it was owned by the grantees, who at his request obligated themselves to pay the loan, which grantees, also at his request, had signed a new declaration of trust in favor of the person who owned an undivided interest in the property with the grantor, tends to show a ratification by such grantor of the previous unauthorized recording of the deed, which he, at the time of its execution, had directed not to be recorded.

APPEAL from the Superior Court of Cook county; the Hon. THEODORE BRENTANO, Judge, presiding.

The appellee filed his bill in the superior court of Cook county October 27, 1904, praying that two deeds which he signed as grantor, and in which his children, Clayton A. Pratt, Rodney K. Pratt and Elizabeth C. Phelps, are named as grantees, be canceled and set aside as a cloud upon the title to the property therein described, on the ground that the said deeds were never legally delivered. The trial court, in a decree entered July 6, 1905, found that the two deeds were filed for record without the knowledge, authority or consent of appellee; that he never ratified them or made a legal delivery with intent to pass present title, and ordered the deeds to be set aside as a cloud upon the title of appellee. The court also ordered that appellee should enter into a bond of $20,000 to indemnify appellants for signing cer-

tain notes to renew a loan on a portion of said property. During the trial the son Rodney K. Pratt and wife signed a disclaimer. The other two children prayed an appeal from the decree of the superior court.

PECK, MILLER & STARR, and RYAN, MERTON & NEWBURY, for appellants.

HENRY RUSSELL PLATT, (CLARK & CLARK, of counsel,) for appellee.

Mr. JUSTICE FARMER delivered the opinion of the court:

It appears from the evidence that in October, 1903, Lorenzo Pratt, then seventy-seven years of age, having been advised by his physician that he had not long to live, signed and acknowledged two deeds, in each of which his three children were the grantees of certain property of considerable value in Cook county, including a large number of lots in Morgan Park, about twenty-five acres of unimproved property, and an apartment building in Chicago. These deeds were handed by appellee to his son Rodney K. Pratt, one on October 22, 1903, and the other on October 28, 1903. Appellee testified that when he handed the first deed to Rodney he said: "You understand this is not to go on record; you take it to my office and put it in the desk with my papers; if I should live I shall destroy it, but if I should die you can then take it and put it on record; the deed itself shows how I want to distribute the property." He testifies that he said substantially the same when he handed Rodney the second deed. Rodney and the attorney, Mr. Schoenfeld, who took the acknowledgment of both deeds, testified to the same thing. The testimony is all to the effect that appellee made the deeds because he felt that he had but a short time to live and wanted to dispose of his property so that at his death his children could handle it without embarrassment; that he did not wish it to go through the probate court and be

tied up for two years.   He testifies that he told his children Clayton and Bessie that he expected to retain control of the property and the deeds were not to be recorded until after his death.   Rodney testifies that he had something of the same talk with his brother and sister.   Both Clayton and Bessie admit that their father said that he deeded it to them to escape the expense and delay of probate, but they deny that either their father or brother said anything about the deeds being conditional upon the death of the father.   If appellee's testimony as to what was said by him when he gave the deeds to Rodney and as to his talks with his daughter and son Clayton as to the deeds being conditional be correct, then there can be no doubt that in the first instance there was no valid delivery of either deed.   Rodney disobeyed the alleged injunction of his father not to record the deeds, and filed each deed for record the very day it was handed to him.

Appellee has been engaged for years in the real estate business in Chicago in a fairly successful way and accumulated considerable property.   His three children were all married, the two sons having been in business for themselves for some time and the daughter living with her husband in Wisconsin.   Notwithstanding some attempts by counsel on either side to show to the contrary, it does not appear that they did not have such affection for their father as children naturally have.   Nothing indicates that they in any way attempted to influence him in deeding this property.

If, as the weight of the evidence appears to show, the deeds were delivered by appellee to his son Rodney with directions to him to take them to appellee's office and place them in his desk with his papers, there to await the termination of his illness, and if he died the deeds to be then recorded but if he recovered to be destroyed by him, there was no delivery that would then pass title to the grantees; nor would recording them after his decease, if he had died, have operated to vest the title in the grantees.   (*Wilenou* v.

*Handlon*, 207 Ill. 104; *Hayes* v. *Boylan*, 141 id. 400.) But whether the title to the land ever vested in appellee's children does not depend entirely upon whether the deeds were delivered at the time they were executed.

Appellee, before making these deeds, was not the sole owner of all the property. The equitable title to an undivided one-half of a part of it was in his friend Nathaniel S. Bouton. He had given Bouton a declaration of trust showing this interest. In the early part of November, 1903, shortly after these deeds were executed, appellee saw Mr. Bouton's agent, Tod, and told him he had transferred his property to his children. Mr. Bouton's brother the same month saw appellee and said to him he had heard the property had been transferred to the children, and appellee replied, "That's the place where it should go." Bouton himself was out of the city, but his attorney, Mr. Bailey, saw appellee's attorney, Schoenfeld, and said to him that there ought to be a new declaration of trust now that the children owned the property. Schoenfeld replied that if Bailey would draw up such a declaration he would see about having it signed. This was done and the three children signed it, Schoenfeld acknowledging their signatures. This declaration of trust recited that appellee had conveyed the legal title to his children. There was a mortgage of $50,000 on a part of the property conveyed by the deeds in question, and the loan matured shortly after these deeds were made. Appellee in person signed an application for a renewal of this loan in the early part of December, 1903, in which he stated that the title to the property was in his three children. He afterwards, together with all his children, Mr. Bouton, and the respective husband and wife of each, signed an agreement extending this loan. This was dated December 18, 1903, and in it the statement was again made that the children were the owners of the property. He also in November, 1903, through the attorney, Schoenfeld, transferred his life insurance to his children. His recollection on many of the

material facts, doubtless due to age, is not very clear. He frequently contradicts himself. He asserts that he did not know the deeds were recorded until he found them on his desk with the file-mark of the recorder upon them, yet he states that he knew they were recorded at the time of the renewing of the loan just mentioned, in December, 1903. His son Rodney testifies that his father knew in December that the deeds were on record. From the records kept by the recorder of deeds it is evident that they were not returned to the son Rodney and placed in the father's desk until June, 1904, some six months after the new declaration of trust and the renewal of the loan. This fact is entirely inconsistent with the claim of appellee that he learned that the deeds had been recorded by finding them in his desk. When he was first asked as to who was present at the time he handed the deeds to his son Rodney he said no one except Rodney, but when interrogated further by somewhat leading questions as to whether Mr. Schoenfeld was not present he said he was not sure. He testified, when first asked about it, that his friend Bouton spoke to him about the new declaration of trust; afterwards he said that Bouton was in Florida at the time, and that he (appellee) knew nothing about the new declaration until after it was signed and acknowledged, but the weight of the evidence contradicts him in this respect. He evidently did know about it. His daughter, Bessie, testified that she signed it in his presence and at his request. His son Clayton testified that his father wrote him requesting him to sign it. Their testimony in this respect is borne out by the rest of the evidence. Appellee testified that he permitted his children to be considered the owners at the time of the renewal of the loan because they told him, after he found the deeds were recorded, that they would re-deed the property to him any time he desired. This claim is not consistent with his own testimony or with the rest of the evidence in the case. Not one disinterested witness testified that appellee ever claimed, before this suit was insti-

tuted, that the title to the property was not in his children because the deed had never been delivered. All of appellee's acts, as well as those of his son Rodney and his attorney, Schoenfeld, for the first six months or more after the signing and acknowledging of these deeds, were entirely inconsistent with any other theory than that he regarded his children as owners of the land. The daughter testified that she stayed with her father from the day the first deed was signed until the first of the following year, with the exception of nine days, and that her father never said anything about the deeds being conditional during that time, although he would often remark that he must go down town to attend to business, but would laughingly add, "You know I haven't much property left to look after;" that he said nothing about the re-deeding of any of the property until the following summer, when she received a letter from him making such request. Clayton testified that the first he knew about his father being dissatisfied with the property being deeded to them was along in the early summer of 1904; that after his father had written to him to this effect he came in July of that year to see him, and after talking it all over with him he left with the understanding that his father was satisfied that the children would deed back any property that he wished to sell for his support, and that he told his father at that time he did not think it wise to deed it all back. The old homestead, formerly belonging to the mother, had been deeded by her, before her death, to the children. It was sold in June, 1904, for $35,000 with the sanction of the father, he signing the deed, and the $35,000 was divided among the three children, the father making no objection. If he was dissatisfied with the recording of the deeds we would have expected him to object to signing the deed to the homestead and letting the children have all the money until something was done to settle up his own affairs. Appellee in the early summer of 1904, or shortly thereafter, for some reason became restive about the property not being in his own name. He had im-

proved in health and wanted to take charge of all his mat-
ters.   That the old gentleman had some feeling against the
daughter, growing out of the subject matter of this litiga-
tion, there is no question.   He testified that if the property
was deeded back to him he did not know whether he would
disinherit her or not; he had not made up his mind about
that.   His feelings grew against his children until he de-
cided to commence this suit.   Clayton and Bessie's testimony
that they never knew until this suit was started that there
was any claim about the deed not being legally delivered
finds strong support from this record.   Whatever conflict
there may be as to the original delivery, it is very clear that
appellee requested his children to sign a new declaration of
trust, in which he permitted them to state that they were the
owners of this property, and that at his request and with his
sanction they obligated themselves to pay $50,000 in renew-
ing the loan in question.

If it be conceded that there was no delivery of the deeds,
at the time they were executed, sufficient to vest title in the
grantees, and that it was not intended that the title should
then pass, it would seem the subsequent acts and conduct of
appellee are irreconcilable with any other view than that he
had changed his mind and intended the deeds previously
made should vest the title in his children.   He was a man
of many years' experience in dealing in real estate and must
have known that the delivery of a deed was necessary to
convey title.   If the deeds were given to his son Rodney
with the instructions appellee says he gave him, there was
no delivery to anyone, but they were to remain in the pos-
session and control of appellee.   He testified he told Rodney
to put the deeds in his (appellee's) desk with his other pa-
pers and if he got well he would destroy them.   If this pur-
pose and intention continued in his mind, why should he,
after recovering his health sufficiently to visit his office and
attend to some business, tell others the property belonged to
his children and advise them to deal with his children as

owners of it? If he had not intended them to have the title, why did he riot, when he discovered his son had caused the deeds to be recorded, repudiate his act and assert his title to the property? Instead of doing this he represented them to others as the owners, and advised his children, on the faith of their supposed title, to declare themselves to be the real owners, and as such to incur heavy financial obligations.

Counsel for appellee contend that at the time of signing the declaration of trust and procuring the extension of the loan he did not know the deeds had been recorded. It is true, he testifies his first knowledge of their having been recorded was when he found them in his desk with the recorder's stamp on them, and it is also true the evidence shows they were not taken out of the recorder's office, after they were filed for record, until some time in June, 1904. It is further true, also, that appellee, in his testimony, repeatedly stated that he knew in November or December, 1903, that the deeds had been recorded. Rodney testified that his father learned the deeds had been recorded by finding them in his desk, but he also testified his father spoke to him about it in December, 1903, just before the extension of the $50,000 loan was made, and told him he had ruined him by placing the deeds on record. Our conclusion that appellee knew the deeds had been recorded when the extension of the loan was made is strengthened by his explanation that the renewal by his children was satisfactory to him because at that time they had agreed to deed the property back to him at any time he wanted it. If he had no knowledge that the deeds had been recorded but supposed they were in his desk, where he told Rodney to put them, then his children had no interest in the property to convey back to him and no interest that made it necessary for them to sign the extension agreement or declaration of trust. Whatever may have been appellee's intention when the deeds were executed, we can come to no other conclusion than that afterwards, and with full knowledge of the fact that they had been recorded, he ratified the

act of his son in placing them on record and treated and confirmed them as vesting title in the grantees.   A deed procured without delivery by the grantor may be subsequently ratified by him so that a good title becomes vested in the grantee.   (Devlin on Deeds, sec. 268*a; McNulty* v. *McNulty,* 47 Kan. 208; *Hadlock* v. *Hadlock,* 22 Ill. 384; *Pittman* v. *Sofley,* 64 id. 155; *Barlow* v. *Robinson,* 174 id. 317.)   In *McNulty* v. *McNulty, supra,* the court say: "We think it clear from the evidence that there was no delivery of the deed of June 30, 1876, in the first instance; but we base our decision on the fundamental truth that a delivery may be made good by a subsequent assent, though originally invalid for want of it, upon the well settled principle that a subsequent ratification may have a retrospective effect."

*Wilenou* v. *Handlon, supra,* and *Hayes* v. *Boylan, supra,* are not in conflict with these views, for in these cases the question was one of delivery, simply, and there was no question of the grantor having induced the grantees to incur expense or liability on the supposition that the deeds vested title in them.   In the *Wilenou case* the grantor made a deed purporting to convey a present title to his three daughters. The notary public who prepared the deed and took the acknowledgment, at the grantor's request caused it to be recorded and then returned it to the grantor.   The deed was never delivered to the grantees, though the grantor repeatedly said the land was to go to them at his death.   The facts are similar in *Hayes* v. *Boylan.*   In both these cases the doctrine of ratification of title under a deed that is inoperative at the time of its execution for want of delivery, though not involved, is recognized.

We are of opinion the court erred in setting aside the conveyances, and the decree will accordingly be reversed and the cause remanded, with directions to dismiss the bill.

                                        *Reversed and remanded.*