Tressler Coal Mining Company v. Commissioner.
Tressler Coal Mining Co. v. Commissioner
Docket No. 11060.
United States Tax Court
1948 Tax Ct. Memo LEXIS 21; 7 T.C.M. (CCH) 941; T.C.M. (RIA) 48266; December 8, 1948
Fred B. Deem, Esq., for the petitioner. Paul E. Waring, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The respondent determined that there were deficiencies in the income, declared value excess profits tax, and the excess profits tax liability of the petitioner for the calendar year 1942, and he added a 25 per cent penalty to the excess profits tax for failure of petitioner to file an excess profits tax return within the time prescribed by law. At the hearing, under an amended answer, the respondent made claim, under section 272 (c) of the Internal Revenue Code, for increases in the deficiencies in declared value excess profits tax, and in the excess profits tax and the penalty. The determinations of the respondent, taking into account *22 the increases in deficiencies claimed, are that there were deficiencies in taxes for 1942, as follows: Deficiency
Penalty
Income Tax
$ 1,355.05 $0
Declared Value Excess
Profits Tax
3,525.85
0
Excess Profits Tax
17,487.92
4,371.98
Petitioner contests part of the determination of the respondent, conceding that some of the adjustments were made correctly. The pleadings present four issues under which determination must be made of the following: 1. The cost basis to petitioner of the Barry Mine for purposes of the 1942 depletion allowance. 2. The estimated recoverable units of coal in the property for purposes of the 1942 depletion allowance, and for depreciation of certain additions to the Barry Mine. 3. The cost of certain improvements to the Barry Mine for purposes of depreciation. 4. The ownership of another mining property known as the Tressler Coal Mine for the purpose of determining whether payments which petitioner made in 1942 to S. B. Tressler were "royalties" for which deduction is allowable. Petitioner filed its income tax return, Form 1120, with the collector for the district of West Virginia. The record in this proceeding consists *23 of testimony, exhibits, and a stipulation. Issue 1 Findings of Fact Petitioner, a West Virginia corporation, was organized on May 6, 1934, by S. B. Tressler. Upon the organization of the corporation, Tressler transferred by deed property known as the Barry Mine, a coal deposit property, to petitioner in exchange for 98 per cent of its stock. The remaining shares of stock were qualifying shares. Tressler purchased the Barry Mine in October 1930, at a Commissioners' sale at Grafton, West Virginia, upon defaults of the former owner in payments upon indebtedness. The purchase price was $31,000 of which Tressler paid $15,500 in cash, and gave his note for the balance, $15,500, payable six months thereafter, with interest at 6 per cent. Tressler made a further payment of $5,500, leaving a balance due on his note of $10,000. Thereafter, Tressler brought suit in the Circuit Court of Taylor County for the abatement of the $10,000 due on the purchase price because some equipment had been removed from the mine. While the suit was pending, Tressler did not pay interest on the note. The court held that the purchase price should be reduced by the amount of $5,573.48, to $25,426.52, and *24 that Tressler should pay to the Commissioners the balance of $4,426.52, plus interest from September 8, 1930, in the amount of $2,752.39. Tressler paid the unabated balance, and interest. Tressler expended $2,801.09, attorney's fees, witnesses fees, and costs in the prosecution of the litigation. Opinion Respondent agrees that the basis of the Barry Mine property to Tressler carried over to petitioner, petitioner having issued more than 80 per cent of its stock to Tressler in exchange for the property in a tax-free exchange. Section 112(b)(5), Revenue Act of 1934. The question is whether the basis of the property should be adjusted by adding to cost the legal fees and expenses paid in pursuit of litigation over the purchase price, and the interest on the part of the purchase price which was unpaid until the conclusion of the litigation. As to the facts: The parties are now agreed that Tressler made cash payments in the purchase of the property aggregating $25,426.52, and that he paid interest, under court order, in the sum of $2,752.39. Respondent does not agree that Tressler expended $2,801.90 for legal fees and court costs, contending that there is failure of proof as to *25 the amount of these alleged expenditures. We are satisfied from the evidence that Tressler paid the total amount of $2,801.09 for legal fees, court costs and other expenses of the litigation, and have found as a fact that the expenditures amounted to $2,801.09. The first question is whether the legal fees and expenses of the litigation are to be added to the cost of the property as capital expenditures. The facts are that Tressler purchased the property at a Commissioners' sale for an agreed price of $31,000, but that subsequently he discovered that some equipment had been removed from the mine, whereupon he brought suit for abatement of $10,000 of the purchase price which had not been paid at the time of filing the suit. The issue raised in that suit involved, in substance, the claim that all of the property for which a price of $31,000 was agreed upon, had not been transferred to the purchaser, Tressler; and he sought an adjustment in the price to a lesser amount for the property actually received in the transaction. Respondent makes no contention that legal fees and expenses of the type involved are not capital expenditures, but limits his contention to the question of fact, *26 the amount of the expenditures. Having found that the expenditures were made in the amount claimed, this question must be decided in petitioner's favor. The expenditures were incident to the purchase and sale of the Barry Mine property. Attorney's fees and other expenditures incident to the sale of property are treated, ordinarily, as capital expenditures. Victoria Paper Mills Co., 32 B.T.A. 666, 667; aff'd, 83 Fed. (2d) 1022; Regulations 86, Article 24-2; Porter Royalty Pool, Inc. v. Commissioner, 165 Fed. (2d) 933, (decided February 3, 1948); William Justin Petit, 8 T.C. 228. It is held that the expenses in question were capital expenditures and constituted part of the cost of the property. The second question is whether interest paid under the court decree, upon the unpaid balance of the purchase price, was a capital expenditure. It is sometimes a difficult question whether a payment constitutes "interest" or something else having the nature of a capital expenditure. However, petitioner does not contend that the amount of $2,752.39, which was paid as "interest" on the note given by Tressler for the unpaid part of the purchase *27 price was not "interest," and he cites no authority by virtue of which the payment in question would be treated as something other than "interest." Furthermore, the decree of the Circuit Court of Talyor County designated the amount as "interest" on the unpaid balance of the purchase price. The question relates, therefore, to a payment of interest on the unpaid balance of the purchase price. Petitioner does not cite any authority in support of its contention that the interest which Tressler paid on his notes for the balance of the purchase price of the Barry Mine property constitutes a capital expenditure to be added to the cost of the property. The Barry Mine property does not come within the class "unimproved and unproductive real property" within the meaning of those words in section 113 (b) (1) (A) of the Revenue Act of 1932, and, therefore, the interest payment cannot be treated as a "carrying charge" which may be capitalized. Interest is, under the Revenue acts, a current expenditure, rather than a capital expenditure, as a rule. Whatever other treatment it might be possible to give to an expenditure called "interest," under other facts and special circumstances, the evidence *28 in this proceeding does not support a claim that the interest in question was a capital expense, properly to be added to the cost of the Barry Mine property. Cf. Queensboro Corporation, 46 B.T.A. 1216, aff'd, 134 Fed. (2d) 942. But for the special provision in section 113 (b) (1) (A), a taxpayer would have no right to capitalize interest. Central Real Estate Co. v. Commissioner, 47 Fed. (2d) 1036. There is no evidence in the record in this proceeding upon which a finding of fact could be made that the Barry Mine property was "unimproved and unproductive" property. Such evidence as there is about this property shows that the mine had been operated prior to the time it was purchased by Tressler, and that it was operated in the year the interest in question was paid. This Court has considered, previously, the question raised in this proceeding, and has held that if the property, in connection with which interest is incurred, is not "unimproved and unproductive real property," the interest cannot be capitalized. See Kentucky Natural Gas Corporation, 47 B.T.A. 330, 339 to 341. It is held that the interest on the notes of Tressler, *29 given in connection with the purchase of the Barry Mine property, was not a capital expenditure and cannot be added to the cost basis of the property. Under our holdings under this issue, the basis of the Barry Mine property is $28,227.61, cost plus legal fees, and other expenses of litigation over the purchase price. Issue 2 Findings of Fact Petitioner did not carry on operations of the Barry Mine during 1934, but did carry on operations on a small scale in each year thereafter, as is shown by its income tax returns. Except for the year 1937, when $511.39, net income was reported, petitioner reported loss in its returns for each year, through 1941. Petitioner did not take any deduction for depletion in any year until 1941 when it reported in its return that it had recovered 65,803 tons of coal in that year, and claimed deduction of $13,160 at the rate of twenty cents per ton. No explanation was given in the return for the rate used of twenty cents per ton. Income, deductions, and loss reported for 1941 were as follows: Total income, $33,234.23; total deductions, $35,118.56; loss, $1,884.33. For the year 1942, the taxable year in this proceeding, petitioner reported total *30 income of $77,825.41, and total deductions in the identical amount, $77,825.41. Also, gross receipts, cost of operations, and gross profit from operations were reported as follows: Gross receipts
$291,738.86
Cost of operations
216,507.20
Gross profit
$ 75,231.66
Petitioner realized the highest amount of gross receipts in 1942. In 1941, gross receipts were $141,873.44, and gross profit was $34,022.74. Petitioner took deduction for depletion in its 1942 return in the amount of $25,123, on 100,492 tons of coal, computed at the rate of twenty-five cents per ton. S. B. Tressler has been the president of petitioner at all times, and he signed petitioner's income tax returns for 1941 and 1942. The Engineering and Valuation Division of the Bureau of Internal Revenue made an audit of petitioner's return for 1941 and recommended that the taxpayer should be requested to file data pertaining to depletion, since it had not established either the cost basis of the coal lands or the recoverable coal en bloc. The Bureau of Internal Revenue made written request of petitioner, early in 1943 and in October 1943, about the cost of the property and the estimated tons of recoverable *31 coal in place when the property was acquired. S. B. Tressler, as president of petitioner, replied to these inquiries by letters dated February 8, 1943, and November 2, 1943, and in both letters it was stated that the estimated tons of coal in place when petitioner acquired the property was 400,000 tons. Operations of the Barry Mine were completed in 1944, and the mine was depleted in that year. The total net tons of coal taken out of the coal lands by petitioner during the entire period, including 1944, was 333,297 tons. The notice of deficiency in the 1942 taxes of petitioner was mailed on March 1, 1946, and the petition in this proceeding was filed on May 27, 1946. In the petition, petitioner set forth the total net tons of coal recovered during the entire period of operation, as stated above, and alleged that the depletion rate for 1942 should be computed on the basis of 334,000 net tons (round figures). There is no evidence that petitioner made any discovery before the end of 1942, as a result of operations or development, that the estimated recoverable units of coal in place was either less than 400,000 tons, or was 334,000 tons. The discovery that the recoverable coal in *32 the coal lands was about 334,000 tons was made at some time after 1942. Opinion Petitioner took a deduction for depletion in its return for the taxable year in the amount of $25,123. The respondent determined that petitioner had overstated its depletion allowance by the amount of $20,487.81, which was disallowed. Respondent has allowed petitioner a deduction for depletion in the amount of $4,635.19 for 100,492 net tons of coal mined during 1942. Respondent computed the allowance in the following way: The cost basis of the coal lands was taken to be $18,500, and the estimated recoverable tons of coal in place at the date of the acquisition of the property by petitioner was taken to be 400,000 tons. From the above, he determined that the rate of depletion was.046125 per ton. Respondent now concedes that the cost basis of the coal lands was at least $25,426.52, but he contends that the estimated tonnage of coal to be used in arriving at the rate of depletion is 400,000 tons, for computing the depletion allowance for 1942. On brief, respondent contends that the proper rate of depletion is.063566 per ton, and that the allowable depletion is $6,387.87. Petitioner contends that *33 the proper rate of depletion is.09281 per ton; that the cost basis of the property is $31,000, and that the revised estimated recoverable tons of coal in place is 334,000 tons. Petitioner now claims a deduction for depletion in the amount of $9,326.66, and concedes that it overstated the depletion deduction in its return when it deducted $25,123. Petitioner made claim for the first time for a depletion allowance in the lesser amount of $9,326.66 in the petition which gives rise to this proceeding. It has been held under Issue 1, that the cost basis of the Barry Mine property was $28,227.61. Under this holding there must be revision of one of the factors to be used in computing the rate of depletion. The question under this issue is whether the other factor to be used to arrive at the proper rate of depletion for 1942 is an estimate of 400,000 tons, as respondent contends, or an estimate of 334,000 tons, as petitioner contends. Petitioner is seeking approval of a revised estimate of the year 1942. The revised estimate for which petitioner contends is 66,000 tons less than the estimate for which the respondent contends. The parties are agreed that 100,492 tons of coal were recovered *34 in 1942. Under section 23(m) of the Internal Revenue Code, the pertinent part of which is set forth in the margin, [1] there shall be allowed a reasonable allowance for depletion, "according to the peculiar conditions in each case," under regulations prescribed by the Commissioner. In any case where it is ascertained as a result of operations or of development work that the recoverable units are greater or less than the prior estimate thereof, then such prior estimate shall be revised and the allowance "for subsequent taxable years" shall be based upon such revised estimate. The pertinent regulations of the Commissioner are sections 29.23(m)-1 and 29.23(m)-9 of Regulations 111. In section 29.23(m)-9, the Commissioner has construed the statute to mean that the ascertainment of facts upon which a revised estimate of recoverable units of mineral in the property is to be made, must be "prior to the close of the taxable year," in order that the depletion allowance for the taxable year may be based upon the revised estimate. [2]
*35 The statutory provision section, section 23 (m), allows a taxpayer to make revision of the depletion schedule when it is discovered from operations or development work that the recoverable units of mineral deposit are greater or less than the prior estimate thereof; and the revision shall be used prospectively, and is applicable only after the discovery of the facts which require revision of the prior estimate. See Petit Anse Co. v. Commissioner, 155 Fed. (2d) 797, 799, and cases cited therein. The evidence in this proceeding shows that petitioner did not take any deduction for depletion until 1941. The return for the year 1941, which is in evidence, shows that petitioner computed depletion at the rate of 20 cents per ton, and deducted $13,160.60 as allowable depletion on 65,803 tons mined in that year, which represented an estimate of 155,000 tons, total recoverable units. As has been set forth in the findings of fact, the Commissioner questioned the correctness of the rate of depletion which was used in computing the deduction, and when petitioner was requested, early in 1943 and in October 1943, to state the estimated tons in place when it acquired the property, *36 it replied under letters dated February 8, 1943 and November 2, 1943, through its president, S. B. Tressler, that the estimated recoverable units were 400,000 tons. The income tax return of petitioner was filed on March 15, 1943, and at that time petitioner's estimate of coal in place at the time of acquisition was 400,000 tons. The facts are clear that there was no discovery during the year 1942 of any facts upon which downward revision of estimated recoverable units in the amount of 334,000 tons could be made before the end of 1942. It is our understanding that petitioner agreed, when its 1941 return was audited, that 400,000 tons was the correct estimate to be used in computing the allowance for depletion in 1941, the year prior to the taxable year, and that this agreement was made, not only after the return for 1941 was filed, but before the return for 1942 was filed. The record in this proceeding shows that an accountant prepared the computation of the allowance for depletion for 1942 for which petitioner now contends, upon the basis of the actual production for the entire period during which petitioner operated the Barry Mine, which ended in 1944. That is to say, he prepared *37 the computation after 1944, upon a revised depletion schedule based upon facts of operation of the mine which were not known until the end of 1944. In other words, petitioner seeks to apply, retroactively, a revised depletion schedule based upon discoveries made after the taxable year. The provisions of section 23 (m) do not permit such retroactive application of a revision in the estimate of recoverable units. To sustain petitioner's contention that the estimated recoverable units of 1942 were 334,000 tons, rather than 400,000 tons, would constitute "a clear cut mistake of law" as was held by the court in Petit Anse Co. v. Commissioner, supra.Accordingly, the contention of the petitioner under this issue must be rejected. It is held that the rate of application for 1942 is properly to be computed upon the basis of estimated tonnage of coal in place in the amount of 400,000 tons. The rate of depletion will be computed by the parties, on the basis of our holdings under Issues 1 and 2, under Rule 50. Issue 3 Findings of Fact In certain years prior to 1942, petitioner took deductions for depreciation in its income tax returns. In three years, 1934, 1937, and 1938, *38 no deductions were taken for depreciation. The depreciation deductions were taken on one or two motor cars and a Diesel engine, as follows: 1935
$ 725
1936
1,350
1939
1,014.40
1940
343.25
1941
742.93 Petitioner deducted $1,834.77 for depreciation on one truck and two motor cars in its return for 1942, which respondent allowed. During the period October 1, 1930 to May 22, 1934, S. B. Tressler made improvements at the Barry Mine and purchased mine cars, machinery, and a Diesel engine at a total cost of $10,317.60. During the same period, certain improvements were made to put the mine in readiness for operation, and certain equipment was purchased, as follows: Repairs of tipple, $1,450; re-tieing of mine, $1,250; steel rails, $800; and labor costs for re-tieing and relaying rails, $1,250; total, $4,750. In addition, $5,000 was expended for cleaning up and rehabilitating the mine property. The total cost of improvements and equipment was $20,067.60. Opinion The question under this issue is whether petitioner is entitled to a further deduction for depreciation for improvements and equipment at the Barry Mine which were made and acquired to recondition *39 the mine for operation. Petitioner made claim for the additional deduction for depreciation in its petition, for the first time, alleging that $31,500 was spent in reconditioning the mine. Petitioner made claim in its petition for an additional deduction for depreciation in the amount of $9,477.40. In computing the amount of the claimed deduction, petitioner used a rate for taking depreciation based, in part, upon a total cost of $31,500. On brief, petitioner receded from the allegation it made in the petition of the cost to be considered, and now contends that it has proved that the cost of improvements and additional equipment was $25,767.60. Respondent disputes the claimed cost of improvements in excess of $10,317.60. [3] Based upon the evidence, respondent has stipulated that during the period October 1, 1930 to May 22, 1934, S. B. Tressler made certain improvements and purchased certain equipment at a total cost of $10,317.60. The parties disagree about the difference in the now alleged costs to the extent *40 of $15,450, petitioner contending that the evidence shows that the latter amount was, in fact, expended. The question is one of fact, under which petitioner has the burden of proof. The evidence under this issue consists of testimony of S. B. Tressler and other witnesses, who performed work in reconditioning the mine property. The only evidence relating to the costs is the testimony of S. B. Tressler who made rough estimates based upon memory. He testified that all of the accounting records of petitioner for the earlier years had been stolen or destroyed. The testimony of others corroborated Tressler's testimony about the condition of the mine, the tipple, rails, rail bed and ties, carts, and certain equipment. From all of the testimony, we are satisfied that when Tressler purchased the mine property it was in very poor condition and required rehabilitation and new equipment; and that expenditures were made for these purposes, apart from the expenditures covered by the stipulation of the parties in the amount of $10,317.60. The loss of records to prove, accurately, the amount of the expenditures greatly handicaps petitioner in meeting its burden of proof. And, the testimony of *41 Tressler, relating to costs, is not entirely satisfactory because it is based upon very general estimates made from memory. On the other hand, Tressler has had long experience in the coal mining business, and his estimates, based upon his memory, must be given some weight. The problem under this issue is somewhat like the one which existed in the case of Cohan v. Commissioner, 39 Fed. (2d) 540, where it was said that we should make "as close an approximation" as can be made, bearing heavily upon the taxpayer "whose inexactitude is of his own making." Applying this rule in this proceeding, we have made the best approximation of the costs of the improvements and equipment as we can, upon the record before us, and have found as a fact that the total additional cost was $9,750. It is held that petitioner is entitled to a deduction for additional depreciation which shall be computed upon the basis, in part, of a total cost of $20,067.60. The computation of the additional deduction for depreciation can be made under Rule 50. Issue 4 Findings of Fact At some time prior to 1933, coal lands known as the Tressler Mine were owned by the Tressler Coal Company, another corporation *42 separate and distinct from petitioner. In 1933, the Tressler Mine property was sold at foreclosure to Peoples-Pittsburgh Trust Company, and thereafter it was held by Peoples-Pittsburgh Trust Company and John S. C. Herron, trustees. On March 16, 1936, the Peoples-Pittsburgh Trust Company and John S. C. Herron, trustees, conveyed the property to Frank Marra for the sum of $7,000. This deed was recorded on March 23, 1936. Marra acted as a "straw man." The $7,000 which was used to purchase the Tressler Mine in the name of Marra in March 1936, was derived from the sale of Chrysler stock in 1935 by petitioner, which was held by petitioner, in its name. On May 13, 1937, Frank Marra and his wife, Maria, executed a deed conveying the Tressler Mine to the petitioner. The deed was prepared by E. Wayne Talbott, who was attorney for S. B. Tressler and for the petitioner, and was drawn by him in accordance with instructions received by him at that time. Frank Marra and his wife went to Talbott's office, signed and acknowledged the deed, and left it there. The deed was not recorded in the office of the county clerk of Barbour County until October 7, 1946. On May 14, 1937, a special meeting *43 of the stockholders of petitioner corporation was held. These minutes stated that: "There were present, H. W. Tressler [brother of S. B. Tressler] and B. M. Compton, in person, and W. Bruce Talbott by proxy, constituting all of the outstanding stock of the Tressler Coal Mining Company." The minutes of the meeting further stated, in part, as follows: "On further motion duly made and carried, it was ordered that the said corporation do purchase from Frank Marra all the land, coal and mining rights and privileges heretofore sold to the said Frank Marra by the Peoples-Pittsburgh Trust Company, a corporation, and John S. C. Herron, trustee under the will of J. B. Findley, deceased, dated March 16, 1936, which said properties are known as 'Tressler Coal Company Properties' situated in Bear Mountain of Pleasant District of Barbour County, West Virginia, for the sum of $7,500.00, and that deeds to said properties be accepted and duly recorded in the Barbour County Clerk's Office. "Upon motion further made and duly carried, it is ordered that a mortgage or deed of trust be executed by this company upon all the properties, consisting of coal lands and mining equipment, in Taylor County *44 and Barbour County, West Virginia, which properties are known as the Barry Mining Property, in Taylor County, West Virginia, and the Tressler Coal Company property in Barbour County, West Virginia, to secure the payment of indebtedness in the amount of twenty-five thousand dollars ($25,000.00), represented by ten notes in the amount of twenty-five hundred dollars each, to the First National Bank of Apollo, Apollo, Pennsylvania, and that president of said corporation be authorized to execute and acknowledge said deed of trust." S. B. Tressler did not make any money during the years 1932 to 1935, inclusive, and did not file income tax returns for these years. He suffered losses during these years on the sale of securities. At the time of the purchase of the Tressler Mine in the name of Frank Marra on March 16, 1936, S. B. Tressler was indebted to the Peoples-Pittsburgh Trust Company as an endorser on notes of the Tressler Coal Company in the amount of $15,643 and to the Commissioners appointed by the Circuit Court of Taylor County, West Virginia, for the unpaid purchase price of the Barry Mine in the amount of $10,000. On May 13, 1937, when Marra and his wife executed the deed of *45 the Tressler Mine property to petitioner, S. B. Tressler was in Pennsylvania confined in an institution. He was confined in the institution from December 1936 until April 28, 1939. He did not participate in any of the arrangements for the preparation and execution of the deed from Marra to petitioner. All of the shares of petitioner corporation had been transferred by assignment from S. B. Tressler to his brother, H. W. Tressler, and an attorney, Wayne Talbott, who had full authority to vote the shares of stock. On September 28, 1946, the petitioner transferred the Tressler Mine property to William T. George by a deed executed by the petitioner. S. B. Tressler executed the deed as president of petitioner, and the deed contained the corporate seal of petitioner. The deed was recorded on October 7, 1946. During the year 1942 the petitioner removed 45,539 tons of coal from the Tressler Mine which was fully depleted in 1942. During the taxable year 1942 petitioner was the owner of the Tressler Mine, and it is not entitled to a deduction from gross income for that year of $13,661.70 as "Royalties." The funds, $7,000, required as the consideration to purchase the property were funds *46 of petitioner, and it paid the purchase price. Petitioner sustained depletion in the taxable year 1942 on coal extracted from the Tressler Mine in the amount of $3,985.80, representing the difference between the cost of the mine property, $7,500, and the amount of $3,514.20 recovered in 1941. Opinion In its return for the taxable year, petitioner took a deduction in the amount of $13,661.70 for "royalty paid to S. B. Tressler on 45,539 tons mined at Tressler Mine 1942 at 30 cents per ton." Respondent allowed the deduction upon the assumption that petitioner did not own the fee to the Tressler Mine property. Subsequently, upon information that petitioner owned the property, respondent determined that the deduction for royalties should have been disallowed. Respondent filed an amendment to his answer in this proceeding alleging that the deduction should not be allowed, and made claim for increase in the deficiency. The question under this issue is whether the payment to S. B. Tressler of $13,661.70 represented royalty payments under a lease of the Tressler Mine. Under this issue, respondent had the burden of proof. Respondent introduced evidence in support of his burden of proof. *47 Petitioner contends that the deed executed by Frank Marra and his wife on May 13, 1947, conveying the mine property to it, was not delivered and, therefore, was inoperative to pass title. The evidence shows that on March 16, 1936, the Peoples-Pittsburgh Trust Company and John S. C. Herron, as trustees, sold the Tressler Mine and equipment to Frank Marra for the sum of $7,000. Frank Marra merely acted as a "straw man" in the proceeding. On May 13, 1937, Frank Marra and his wife executed the deed in the office of E. Wayne Talbott, an attorney, conveying the Tressler Mine property to the petitioner, the consideration recited in the deed being $7,500. The deed was thereupon left with Talbott. On May 14, 1937, a special meeting of the stockholders of the petitioner was held and the minutes provided, in part, that the corporation purchase the Tressler Mine property from Marra for $7,500, and that deeds to the property be "accepted" and duly recorded. The evidence shows, further, that the funds used to purchase the Tressler Mine were the proceeds from shares of Chrysler stock which petitioner held in its name, sold, and reported in its return for 1935; and that Talbott, the attorney who *48 received the deed from Marra, was a stockholder and a director of petitioner. From the evidence it is clear that petitioner paid the consideration for the property in the first instance when it was purchased in the name of Marra, as a "straw man" for $7,000. S. B. Tressler, testifying in this proceeding, stated that he understood that the proceeds from sale of the Chrysler stock were used to pay the purchase price. However, petitioner takes the position that the Chrysler stock belonged to S. B. Tressler. The evidence shows that the stock was an asset of petitioner. The principle that a corporation is an entity separate from its stockholder must be applied here, and we must reject the implied contention of petitioner that S. B. Tressler provided the funds for the purchase of the property, which were derived from the sale of the Chrysler stock. Other evidence carries a strong implication that S. B. Tressler was low in funds, or without them in 1936 and 1937, and there is evidence that he was obligated to pay substantial amounts on notes, and a judgment. Also, he was confined in an institution during all of 1937. This evidence indicates that Tressler did not provide the purchase price *49 of the property. On the disputed point of delivery of the deed to petitioner, the evidence indicates that the attorney who prepared the deed, Talbott, accepted delivery of it. He testified in this proceeding, and he did not deny accepting delivery of the deed. The evidence indicates, further, that he accepted delivery of the deed for petitioner, which is named as the transferee in the deed. There is no evidence to indicate that he accepted delivery for S. B. Tressler, and Tressler was not named the transferee of the property in the deed. The minutes of a meeting of petitioner's stockholders, held on May 14, 1937, authorized that the deeds to the property be "accepted" by petitioner. There is no evidence to show that Marra continued to be the owner of the property after May 14, 1937. The evidence shows that it was intended by Marra and by petitioner that title to the property should pass immediately to petitioner. There were no conditions or contingencies upon which passage of title to petitioner was made to depend. Petitioner's argument is, at best, that passage of title in May 1937, was defeated by lack of formalities of some sort in delivery. The argument must be rejected. It is *50 clear that the grantor, Marra, in executing the deed, intended that title should pass to petitioner. "A constructive delivery is sufficient. The delivery is made if an intention appears that the deed shall be legally operative, however that intention appears." Woodrum v. Price, (Supreme Court of Appeals of West Virginia) 140 S.E. 346, 348. See, also, Brown v. Rodgers, 248 S.W. 750; and Hunt v. Hunt, 91 W. Va. 685; 114 S.E. 283, 286, where the court said: "* * *. Delivery of the deed in many cases is a matter of intention, and where the circumstances are such that an intent to deliver is plainly apparent and where the grantor has executed and acknowledged it with that purpose and desire, the conveyance is as effective as if the deed had been actually delivered. Foreman v. Roush, 87 W. Va. 341, 105 S.E. 157." Then, there are the facts that the deed from Marra to petitioner was finally recorded, belatedly, in 1946; and that petitioner deeded the property to William T. George in 1946, and that he recorded petitioner's deed to him. Petitioner acted as the owner of title. There is no evidence that Marra asserted any *51 ownership over the property after he executed the deed and left it, or gave it, to Talbott, in 1937. Cf. Phelps v. Pratt, 225 Ill. 85; 80 N.E. 69, 72. Petitioner admits that Marra acted as a "straw man" in the purchase of the property in March 1936, from Peoples-Pittsburgh Trust Company and John S. C. Herron. It appears to be petitioner's contention that Marra was acting for S. B. Tressler, in his individual capacity. But there is no evidence from which we could find as a fact that S. B. Tressler was the undisclosed principal. There is no evidence that he furnished funds to Marra to purchase the property, out of his own funds, separate from the petitioner corporation's funds; and, to the contrary, Tressler has testified that the funds used were those realized by petitioner when it sold Chrysler stock in 1935, which it held in its name. There is no evidence that Tressler ever exercised ownership over the property in his individual capacity, after Marra took title in his name in March 1936. That is to say, there is no evidence that Tressler exercised any rights of ownership, himself, over the property between March 16, 1936, and May 13, 1937, when Marra executed *52 a deed to petitioner. The evidence indicates to us that the undisclosed principal of Marra on March 16, 1936, was petitioner. For some reason, which the record does not disclose, Marra was not called upon to deed the property to petitioner until May 13, 1937, about one year after he took title from Pittsburgh Trust and Herron. However that may be, for the purposes of this proceeding, all that we can look to is the record in this proceeding, and we cannot find from any evidence before us that Tressler was the real owner of the property on and after March 16, 1936. The evidence indicates to us (1) that the deed from Marra to petitioner, dated May 13, 1937, was only to effect formal transfer of title to the real owner, the petitioner, which had provided the purchase price, in the first instance, in the purchase from Peoples-Pittsburgh and Herron; and (2) that the deed from Marra did not represent a conveyance from Tressler (who had not become the real owner on March 16, 1936) to petitioner. In short, it appears that the purchase on March 16, 1936, by Marra, as "straw man," and the deed of May 13, 1937, from Marra to petitioner were merely steps in one transaction, namely, purchase of *53 the property by petitioner. Petitioner takes the view that it operated the Tressler Mine in 1941 and 1942 as a lessee of S. B. Tressler, but petitioner did not offer any evidence to show that there was any lease arrangement. This contention must be rejected. Petitioner suggests that respondent's present contention should not be approved because he allowed petitioner to take a deduction in its 1941 return for "royalties" paid to Tressler. Respondent is not bound, in determining the correct net income of petitioner for 1942, by his prior ruling with respect to petitioner's tax liability for 1941. Respondent now relies upon newly discovered facts. See John M. Parker Co., 11 B.T.A. 1236, 1246. Under the circumstances and facts shown by the record, it is concluded that petitioner owned the fee-title to the Tressler Mine, and that the payment of $13,661.70 to S. B. Tressler in the taxable year was not payment of royalties, but was a distribution of earnings. Petitioner is not entitled to deduction of $13,661.70. Since petitioner owned the Tressler Mine, it is entitled to deduction for depletion. Respondent has computed the allowable depletion to be $3,985.80. Petitioner *54 does not object to the amount which respondent has computed. Petitioner did not file an excess profits tax return for the taxable year. Petitioner has not offered any reasons or explanations for its failure to do so, and, in the pleadings, no allegation of error is made with respect to respondent's addition of penalty for failure to file the return. There is no issue raised by the pleadings relating to the correctness of the determination of the penalty. See Section 291, Internal Revenue Code; and Burford Oil Co., 4 T.C. 613, 618. Decision will be entered under Rule 50. Footnotes
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(m) Depletion. - In the case of mines * * * a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary. In any case in which it is ascertained as a result of operations or of development work that the recoverable units are greater or less than the prior estimate thereof, then such prior estimate (but not the basis for depletion) shall be revised and the allowance under this subsection for subsequent taxable years shall be based upon such revised estimate. * * *. ↩
2. Regulations 111. Section 29.23(m)-9. * * *
If the number of recoverable units of mineral in the property has been previously estimated for the prior year or years, and if there has been no known change in the facts upon which the prior estimate was based, the number of recoverable units of mineral in the property as of the taxable year will be the number remaining from the prior estimate, but in any case in which it is ascertained either by the taxpayer or the Commissioner as the result of operations or development work prior to the close of the taxable year that the remaining recoverable mineral units as of the taxable year are materially greater or less than the number remaining from the prior estimate, then the estimate of the remaining recoverable units shall be revised and the annual depletion allowance with respect to the property for the taxable year and for subsequent taxable years will be based upon the revised estimate unless a change in the facts requires another revision. Such revised estimate will not, however, affect the basis for depletion.↩
3. There is included in this amount the cost of a Diesel engine purchased August 22, 1935, but no depreciation on this item of property was taken in the 1942 return.↩